## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF ALABAMA

IN RE:

Case No. 09-12616-MAM

BENDER SHIPBUILDING &
REPAIR CO., INC.

### DEBTOR

### MOTION OF THE DEBTOR PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 AND FED. R. BANKR. P. 2002, 6004 AND 6006 FOR AN ORDER (A) APPROVING THE SALE OF CERTAIN ASSETS, AND ASSIGNMENT OF CERTAIN CONTRACTS, TO VISION TECHNOLOGIES MARINE, INC. OR OTHER SUCCESSFUL BIDDER(S) AT AUCTION, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS (INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT); AND (C) <u>APPROVING THE FORM AND MANNER OF NOTICE THEREOF</u>

**NOW INTO COURT**, through undersigned counsel, comes Bender Shipbuilding

& Repair Co., Inc. (the "*Debtor*"), pursuant to 11 U.S.C. §§ 105, 363, and 365 of Title 11

of the United States Code (the "*Bankruptcy Code*") and Rules 2002, 6004 and 6006 of the

Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), and hereby moves for

the (a) entry of an order, substantially in the form attached hereto as Exhibit A (the "*Sale

Order*"), (i) authorizing the sale of certain assets, the assumption and assignment of

certain contracts, and the assignment and assumption of certain unexpired leases, to

Vision Technologies Marine, Inc., ("*VTM*" or the "*Buyer*") or other successful bidder(s)

at auction, free and clear of all liens, claims, encumbrances and interests (the "*Sale*") and

(ii) approving that certain Asset Purchase Agreement, dated as of December 14, 2009,

between the Debtor and VTM (the "*Purchase Agreement*"), a copy of which is attached

hereto as Exhibit B and incorporated herein by reference, and (b) entry of an order,

substantially in the form attached hereto as Exhibit C (the "*Bidding Procedures Order*"), (i) approving bidding procedures and certain bid protections in connection with the Sale, including the Break-Up Fee,[1] Expense Reimbursement and Overbid Amount (as defined below) (ii) approving the form and manner of the Sale Notice Package (as defined below), and (iii) setting a date for a hearing to approve the Sale (the "*Sale Hearing*"). In support of this Motion, the Debtor respectfully represents as follows:

## Background

1.      On June 9, 2009 (the "*Petition Date*"), an involuntary Chapter 7 petition was filed against the Debtor. An Order for Relief (Docket No. 61) was entered herein on July 1, 2009 ("*Conversion Date*") and the case was converted to a proceeding under Chapter 11 pursuant to an order entered thereafter (Docket No. 66).

2.      Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor has retained possession of its assets and has continued the operation and management of its business in this case as a debtor in possession.

## Jurisdiction

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]   Defined terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

## Factors Leading to the Proposed Sale

Deterioration of the Debtor's Businesses

4.      Since the quarter ending March 31, 2008, the Debtor has experienced considerable losses. In the past year, the Debtor's revenues have largely remained stable or decreased while the Debtor's operating costs have substantially increased, which has caused a drop off in operating profits. Additionally, new business revenue has diminished.

5.      Since the Petition Date, the Debtor, assisted by its financial and legal advisors, has undertaken a complete review of the Debtor's restructuring options with a view towards maximizing the recovery for all creditors. Notwithstanding the Debtor's aggressive restructuring efforts, based on the Debtor's inability to generate positive cash flows, the Debtor has determined that sales of substantially all of its assets are required to preserve the value of the Debtor's assets for the benefit of its creditors.

The Debtor-in-Possession Credit Agreement

6.      The Court entered an interim order on September 25, 2009, (i) approving debtor-in-possession financing from Petrus Private Investments, L.P. (the *"Petrus DIP"*) on an interim basis and (ii) allowing funding under the Petrus DIP in the amount of $1,500,000, which provided working capital that was necessary for the Debtor to operate its businesses during its Chapter 11 case.

7.      General Electric Capital Corporation (*"GECC"*) and Marquette Business Credit, Inc. (*"Marquette"*), the two largest secured creditors of the Debtor, agreed to provide interim replacement debtor-in-possession financing to the Debtor (the *"Replacement Financing"*) for the purpose of (i) satisfying in full the obligations owing

3

to Petrus under the Petrus DIP, as agreed and stipulated on the record, and (ii) providing additional funds, of up to $6,000,000 in the aggregate, to the Debtor according to the terms of a Replacement Financing Agreement (as defined below).

8.     The Debtor determined, in good faith and in the sound exercise of its business judgment, that it was in its best interest, as well as in the best interest of its estate and its creditors, to replace the Petrus DIP with the Replacement Financing.

9.     The Court entered an interim order on October 13, 2009, approving the Replacement Financing to allow the Debtor (i) to obtain funds and financial accommodations required to pay the ongoing operating and administrative expenses of its business and the estate that are incurred through and including November 3, 2009, and (ii) to preserve the value of the estate (the *"Interim DIP Order"*).

10.     Following entry of the Interim DIP Order, the Debtor, GECC and Marquette entered into that certain Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement, dated as of October 13, 2009 (as such may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof in a manner not materially inconsistent with the Interim Order (as defined below), the *"Replacement Financing Agreement"*).

11.     The Court entered a final order on November 3, 2009, authorizing the Debtor to execute a fee letter and incur post-petition, secured financing, and according super-priority administrative claim status (the *"Final DIP Order"*). The Final DIP Order affirmed the Interim DIP Order and approved the Replacement Financing on a final basis.

12.     Pursuant to the terms of the Replacement Financing Agreement, as amended, it is an event of default thereunder if the Debtor fails or neglects to execute an

asset purchase agreement for each of (i) the Restructured Mobile Shipyard ("*RMS*"), on terms and conditions consistent with that certain letter of intent described in Section 5.13(a)(i) of the Replacement Financing Agreement, and otherwise satisfactory to Agent in its sole discretion; (ii) the steel processing center (the "*Steel Processing Center*"), on terms and conditions consistent with that certain letter of intent described in Section 5.13(b)(i) of the Replacement Financing Agreement, and otherwise satisfactory to Agent in its sole and reasonable discretion; and (iii) the Mexican Business (as defined in the Replacement Financing Agreement), on terms and conditions consistent with that certain letter of intent described in Section 5.13(c)(i) of the Replacement Financing Agreement, and otherwise satisfactory to Agent in its sole discretion.

13.    During the marketing process of each of the RMS, the Steel Processing Center and the Mexican Business, the Debtor received an offer from VTM to purchase the RMS. The Debtor thereafter determined that entering into the Purchase Agreement, pursuant to which VTM has become the "stalking horse" and which allows the Debtor to establish an auction process, would maximize the return to all of the Debtor's creditors. Moreover, the Purchase Agreement and this Motion satisfy the sale requirements under the Replacement Financing Agreement.

### **Marketing Efforts**

14.    In August 2009, the Debtor retained Global Hunter Securities, LLC ("*Global Hunter*"),[2] as investment banker to, among other things, assist in determining the best way of maximizing the value of the Debtor's businesses, including soliciting offers from qualified buyers for a possible purchase of certain of the Debtor's assets.

---

[2]    The Debtor's retention of Global Hunter was approved by the Court on a final basis pursuant to an order dated September 25, 2009.

15. Global Hunter has since identified several companies potentially interested in acquiring one or more of the Debtor's assets. As a result of these marketing efforts, the Debtor received numerous expressions of interest and inquiries from parties potentially interested in acquiring certain of the Debtor's assets and, ultimately, a significant number of parties conducted due diligence with respect to the Debtor's assets. Under the existing circumstances, the proposal from VTM afforded the Debtor the best opportunity to sell the Purchased Assets (defined below) on the best available terms.

16. Following extensive, arm's length negotiations with VTM, the parties entered into the Purchase Agreement. Pursuant to the Purchase Agreement, VTM agreed to purchase the Purchased Assets for $21,000,000 in cash, the assumption of certain leases and liabilities of the Debtor, and certain other consideration, all as set forth more fully in the Purchase Agreement, subject to any higher and better offers that may be obtained through an auction process.

## The Purchase Agreement[3]

17. On December 14, 2009, subject to this Court's approval, the Seller (as defined in the Purchase Agreement) and VTM entered into the Purchase Agreement, pursuant to which VTM agreed to purchase and Seller agreed to sell the following assets (each subject to certain conditions), pursuant to Section 2.01(a) of the Purchase Agreement: (i) repair and new construction assets (excluding the Steel Processing Center), including the use of approximately 40 acres of total operating area (including both owned real property and leased property) with 4,400 feet of deep-water frontage accessed by a 42-foot deep channel from the Gulf of Mexico, and two (2) steel floating

---

[3]  To the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control.

6

dry docks known as "Dry Dock Pete B" and "Dry Dock WW," (ii) a non-exclusive, perpetual, royalty-free license to use, modify and sublicense to its Affiliates certain vessel designs, as more specifically identified in the Purchase Agreement, (iii) a non-exclusive, perpetual, royalty-free license to use, modify and sublicense to its Affiliates the Winship Software, as defined in the Purchase Agreement, and (iv) contracts, leases, and liabilities, but only to the extent that such contracts are executory contracts or unexpired leases that are able to be assumed and assigned by the Debtor to VTM, and that relate to goods or services that are necessary, required or reasonably appropriate for the use, maintenance and operation of the Purchased Assets (the "*Assigned Contracts*" and, together with certain assets, certain equipment, rights, title and interest in and to certain Permits and Licenses, and certain Intellectual Property (the "*Purchased Assets*").

18.     The purchase price for the Purchased Assets is $21,000,000, plus (i) the amount of the Break-Up Fee, plus (ii) the Expense Reimbursement (the "*Purchase Price*").

19.     Other key terms of the Purchase Agreement are as follows:

**Excluded Assets**:  All property and assets of the Debtor, other than the Purchased Assets, shall remain the property of the Debtor's estate, including, without limitation, accounts receivable of the Debtor and any contracts, legal or equitable rights of the Debtor and its bankruptcy estate, other than warranties and the Assigned Contracts. As set forth in the Purchase Agreement, the Debtor shall not sell, convey, assign, transfer or deliver, nor cause to be sold, conveyed, assigned, transferred or delivered, to the VTM Debtor's right, title and interest in and to any assets of the Debtor not expressly included in the Purchased Assets.

**Assumption of the Assigned Contracts**: The Debtor will assume and assign to the Buyer the Assigned Contracts at the Closing, as amended and/or restated, as applicable. Cure Costs (as defined below) associated with the Assigned Contracts will be paid from the funds deposited into the Asserted Cure Costs Escrow Agreement in accordance with the terms thereof and in accordance with the terms of the Purchase Agreement.

**Closing Date:** The Closing of the Sale will take place no later than three (3) Business Days following the satisfaction or waiver of the conditions to the obligations set forth in the Purchase Agreement or on such other date as the Debtor and the VTM may mutually agree upon in writing.

**Facilities Use Agreement**: As acknowledged in the Purchase Agreement, the Debtor may have work in progress that will need to be completed after the Closing. VTM agrees that the Debtor shall complete such work in progress pursuant to the terms of that certain Facilities Use Agreement to be entered into by VTM and the Debtor on or following the Closing.

**Vessel Designs**: The Debtor will grant to the VTM a non-exclusive, perpetual, royalty-free license to use, modify and sublicense to its Affiliates the Vessel Designs identified in the Purchase Agreement. Certain of the Vessel Designs may be subject to a license arrangement or other agreement with a third party (a "Vessel License Arrangement"). To the extent that these Vessel License Arrangements are identified, whether identified before or after the date of the Closing, Debtor will assume and assign such Vessel License Arrangements at the election of VTM. If VTM elects to take an

8

assignment of such Vessel License Arrangements, VTM will be responsible for the payment of any Cure Costs, if any, associated with such Vessel License Arrangements.

**Exclusion of Warranties and Continued Obligations:** The Purchased Assets will be sold and delivered and taken over "as is, where is" at the time of Closing without any warranty or representation by the Debtor whatsoever, express or implied, as to the design, quality, condition, merchantability or seaworthiness, or as to the fitness of the Purchased Assets for any particular purpose or trade. Following the Closing, the Debtor shall have no obligation with respect thereto, other than the following, all as more specifically set forth in the Purchase Agreement: (i) certain assurances relating to the actual transfer of the Purchased Assets, (ii) the removal of Excluded Assets, (iii) the payment of the Cure Costs in accordance with the Asserted Cure Costs Escrow Agreement and the Purchase Agreement, (iv) the obligations set forth in the Facilities Use Agreement, (v) the obligations set forth in the Purchase Agreement with respect to the Vessel Designs; (vi) any action set forth in the Purchase Agreement to be taken after the Closing; and (vii) any obligation set forth in the Purchase Agreement with respect to the payment of any amounts by Debtor to VTM that are to be made after the Closing (collectively with each of the foregoing, the "*Continuing Obligations*").

**Administrative Expense Priority Claim**: Should the Debtor default with respect to the satisfaction of one of its Continuing Obligations, VTM may forward to Debtor and to Debtor's counsel by certified mail, return receipt requested, a written Notice of Default (hereinafter referred to as "*Notice*") advising Debtor of the default and requesting Debtor to cure said default within ten (10) days of the posting of said Notice. Should the Debtor fail to cure the default within the ten day period specified in the Notice, upon VTM

9

submitting to this Court a Default Motion along with an Affidavit setting forth Debtor's default, the posting of the Notice to Debtor and Debtor's attorney, and the lack of cure of the default, VTM will be entitled to an allowed administrative expense priority claim in the amount identified in such Notice without further notice or hearing.

**Break-Up Fee/Expense Reimbursement:** Upon the occurrence of a Compensable Termination Event, VTM shall be entitled to (a) payment of a break-up fee (not dependent on amounts actually expended or incurred by the Buyer) in cash or other immediately available funds in the amount of $850,000 (the "*Break-Up Fee*"), and (b) reimbursement by the Debtor (in cash or other immediately available funds) for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred by VTM in connection with the Chapter 11 Case and the negotiation, execution and delivery of this Agreement up to an aggregate amount of $400,000 ("*Expense Reimbursement*"). As set forth in the Purchase Agreement, a "Compensable Termination Event" shall have occurred if VTM is not in material breach of the Purchase Agreement (and the parties have not otherwise terminated the Purchase Agreement pursuant to Section 8.01(f) of the Purchase Agreement and either (i) the Bankruptcy Court approves a Qualified Overbid other than the VTM's Bid, and the closing of a transaction in respect of such other Qualified Overbid has occurred or (ii) the Debtor subsequently liquidates or otherwise disposes of a material portion of the Purchased Assets in one or a series of transactions. The Break-Up Fee and the Expense Reimbursement shall be made to the Buyer concurrently with the occurrence of a Compensable Termination Event.

**Overbid Amount:** The overbid amount is Two Hundred Fifty Thousand Dollars ($250,000) (the "*Overbid Amount*").

**Buyer's Deposit:** Within three (3) Business Days of the execution of the Purchase Agreement, Buyer is required to deposit $300,000 with the Escrow Agent, pursuant to the Escrow Agreement. If other Qualified Bidders make their good faith deposits, Buyer is required to deposit $950,000, the balance of deposit, not later than the date of the Auction, pursuant to the Escrow Agreement (the sum of such deposits, "*Buyer's Deposit*"). Buyer's Deposit, plus any interest or other amount accrued thereon, shall either (i) be applied as a credit towards the Purchase Price, (ii) be returned to Buyer in the event that the Purchase Agreement is terminated (other than due to a material breach by Buyer as provided in the Purchase Agreement), or (iii) be paid to the Debtor in the event that the Purchase Agreement is terminated by the Debtor due to a material breach by Buyer.

**Survival of Representations/Warranties:** All representations and warranties terminate at closing, other than, pursuant to the Purchase Agreement, certain representations and warranties related to environmental matters.

**Buyer's Conditions to Closing:** The Buyer's obligation to close on the Sale is subject to the fulfillment of certain conditions at or prior to the closing of such transaction, including, among other things, that (i) the Debtor has made all filings and have received all material consents, waivers and approvals, (ii) the Debtor has complied in all material respects with its representations and warranties, and have completed all required deliveries, (iii) the Bidding Procedures Order has been entered by the

11

Bankruptcy Court in a form and substance reasonably acceptable to the Buyer and (iii) certain other conditions set forth in Section 7.02 of the Purchase Agreement.

**Seller's Conditions to Closing:** The Debtor's obligation to close on the Sale is subject to fulfillment of certain conditions at or prior to the closing of such transaction, including, among other things, that the Buyer has made all filings and has received all material consents, waivers and approvals, the Buyer has paid the Debtor the Purchase Price and the Buyer has delivered the Escrowed Funds to the Escrow Agent in accordance with the Escrow Agreement, and certain other conditions set forth in Section 7.01 of the Purchase Agreement.

**Termination:** The Purchase Agreement may be terminated, among other reasons, as follows:

(a) by either the Debtor or Buyer if:

(i) the Buyer is not reasonably satisfied with all of its conditions (including without limitation its due diligence conditions) to its obligations to close as described in the Purchase Agreement;

(ii) the Bidding Procedures Order has not been entered by the Bankruptcy Court on or prior to the date that is forty-five (45) days after the date of the Purchase Agreement;

(iii) the Buyer is not selected as the successful bidder and is not the Next Highest Bidder in accordance with the Bidding Procedures;

(iv) in the event that the Buyer is selected as the successful bidder in accordance with the Bidding Procedures, the Transaction Approval Order has not been entered by the Bankruptcy Court on or prior to the Termination Date;

Case 09-12616    Doc 617    Filed 12/15/09    Entered 12/15/09 10:23:39    Desc Main
                            Document        Page 12 of 45

(v) the Closing shall not have occurred by the Termination Date subject to the limitations set forth in the Purchase Agreement; or

(vi)     in the event that any Governmental Order restraining, enjoining or otherwise prohibiting the Transactions shall have become final and nonappealable;

(b)     by the Debtor if the Buyer shall have breached any of its representations, warranties, covenants or other agreements contained in the Purchase Agreement, subject to the limitations set forth in the Purchase Agreement;

(c)     by the Buyer if the Debtor shall have breached any of its representations, warranties, covenants or other agreements contained in the Purchase Agreement, subject to the limitations set forth in the Purchase Agreement;

(d)     by the Buyer if any of the following terms are modified in the Bid Procedures Order from the terms set forth in Exhibit E to the Purchase Agreement without the Buyer's consent: (i) the amount of the Break-Up Fee amount, (ii) the amount of the Expense Reimbursement, or (iii) the timing for payment to the Buyer of the Break-Up Fee or Expense Reimbursement;

(f)     ipso facto, if the Bankruptcy Court does not approve the Purchase Agreement; or

(g)     by the written consent of each of the Debtor and the Buyer.

**Next Highest Bidder:** Provided that a Competing Transaction fails to close and the Purchase Agreement has not been terminated, VTM remains obligated to consummate the Transaction pursuant to the terms of the Purchase Agreement.

## **The Bidding and Auction Process**

20.     The sale of the Purchased Assets pursuant to the Purchase Agreement is subject to higher or better offers. To ensure that maximum value is obtained, the Debtor and VTM have agreed to certain terms and procedures (collectively, the *"Bidding Procedures"*) to govern the submission of competing bids for all or a portion of the Purchased Assets and for the conduct of an auction (the *"Auction"*). The Bidding Procedures are attached hereto as Exhibit D, and, in conjunction with the Purchase Agreement, provide for the following:[4]

a)     Timeline. The Bidding Procedures and Purchase Agreement establish a timeline by which (i) the Debtor is required to obtain certain Court approvals and (ii) certain other events must occur. The Debtor is required to file this Motion by no later than five (5) Business Days following the execution by the parties of the Purchase Agreement. The Debtor shall use its best efforts to cause a hearing on the Bidding Procedures (the *"Bidding Procedures Hearing"*) to be held on **December 29, 2009**. Assuming that the Bidding Procedures Order is entered on December 29, 2009, the Bid Deadline should be scheduled for January 11, 2010, and the Auction (if necessary) should be conducted on January 14, 2010. Given this timing and in accordance with the Purchase Agreement, the Debtor requests that the Court hold the Sale Hearing on January 19, 2010.

b) Determination of "Qualified Bidder" Status. In order to participate in the Bidding Process, each person (a "Potential Bidder"), other than VTM, must deliver to the Debtor: (i) An executed confidentiality agreement in form and

---

[4]   To the extent there are any inconsistencies between the summary description of the Bidding Procedures contained herein and (i) the terms and conditions of the Purchase Agreement and/or (ii) the Bidding Procedures that are attached to the Purchase Agreement, the terms of the Bidding Procedures attached to the Purchase Agreement shall control. Capitalized terms not defined in the summary shall have the meaning ascribed to them in the Bidding Procedures.

substance satisfactory to the Debtor; and (ii) Current audited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to the Debtor demonstrating such Potential Bidder's ability to close the Transaction. A "Qualified Bidder" is a Potential Bidder (1) that timely delivers the documents described in subparagraphs (i) and (ii) above, (2) that the Debtor in its business judgment and in consultation with its advisors and the Committee determines is financially able to consummate the purchase of the Purchased Assets and is reasonably likely (based on the availability of financing, experience, and other considerations) to submit a bona fide offer, and (3) that the Debtor, in its business judgment and in consultation with its advisors, determines would be able to consummate the Transaction. The Debtor, in consultation with its advisors and the Committee, reserves the right to make the sole and final determination of who is a Qualified Bidder so long as any bidder otherwise complies with the Bidding Procedures. VTM is deemed to be a Qualified Bidder for purposes of participating in the Auction.

c) A bid received from a Qualified Bidder other than VTM will constitute a qualified bid ("*Qualified Bid*") only if it includes all of the Required Bid Documents (as defined below) and meets all of the following requirements (collectively, the "*Bid Requirements*"):

A Qualified Bidder, other than VTM, must submit the following "*Required Bid Documents*" in a form acceptable to the Debtor:

Case 09-12616   Doc 617   Filed 12/15/09   Entered 12/15/09 10:23:39   Desc Main
Document   Page 15 of 45

(i)     An executed purchase and sale agreement (a *"Modified Purchase Agreement"*) that (1) contains substantially the same (or more favorable) terms and conditions as those contained in the Purchase Agreement, (2) offers to purchase all of the Purchased Assets, (3) does not contain any due diligence conditions or a financing contingency; (4) proffers a competing bid which is greater than the purchase price contained in the Purchase Agreement by at least $1,500,000.00; (5) provides for a closing date on the sale which is no later than three (3) Business Days following the entry of the Sale Order; and (6) provides that the offer is irrevocable until the closing of a purchase of the Purchased Assets (the *"Closing"*);

(ii)    A good faith deposit (the *"Good Faith Deposit"*) in the form of a certified check (or other immediately available funds) payable to the order of the Debtor (or such other party as the Debtor may determine), in an amount equal to $1,250,000.00 to be held in escrow by the Escrow Agent at BBVA Compass; and

(iii)    A "blacklined" comparison of the Modified Purchase Agreement against the Purchase Agreement to show any changes requested by the Qualified Bidder;

The bid must consist of a good faith, bona fide offer to purchase all of the Purchased Assets for cash or cash equivalents, and/or the assumption of all or a portion of the Debtor's liabilities, which shall be irrevocable until the Closing if such Qualified Bidder is the Prevailing Bidder (as defined below), or if such Qualified Bidder is the Second Highest Bidder (as defined below), until the earlier

of 5:00 p.m. Central time on the first business day that is eight (8) Business Days following the entry of the Sale Order;

The bid must (i) fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, and (ii) include evidence of authorization and approval from each bidding or participating entity's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Purchase Agreement;

The bid must be accompanied by satisfactory evidence of committed financing or other ability to perform the acquisition of the Purchased Assets, including (i) providing evidence satisfactory to the Debtor that the Qualified Bidder has received debt and/or equity funding commitments or has financial resources readily available sufficient in the aggregate to finance the Transaction and (ii) adequate assurance of such Qualified Bidder's ability to perform under any assumed and assigned executory contract or unexpired lease;

The bid must (i) identify with particularity each and every executory contract and unexpired lease, the assumption and assignment or rejection of which is a condition to closing and (ii) contain an undertaking by the Qualified Bidder to apply to the appropriate agency or governmental entity for the transfer or granting of the permits or licenses to be obtained as a condition to closing, within three (3) Business Days of the entry of the Sale Order;

The bid is accompanied by satisfactory evidence of the Qualified Bidder's ability to provide adequate assurance of future performance (within the meaning

Case 09-12616   Doc 617   Filed 12/15/09   Entered 12/15/09 10:23:39   Desc Main
                          Document      Page 17 of 45

of the Bankruptcy Code) under any liabilities, unexpired leases and executory contracts to be assumed by the Debtor and assigned to the Qualified Bidder;

The bid acknowledges and represents that such bid does not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment;

The Qualified Bidder acknowledges and represents that it: (1) has had an opportunity to conduct due diligence regarding the Purchased Assets prior to making its offer and does not require further due diligence; (2) has relied solely upon its own independent review, investigation and inspection of any documents and the Purchased Assets in making its bid; and (3) did not rely upon any (i) written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or (ii) the completeness of any information provided in connection therewith or with the Auction, except as expressly stated in the Bidding Procedures; and

The bid is received by the Bid Deadline.

In evaluating a Qualified Bid, the Debtor must determine that the bid (i) contains terms and conditions no less favorable to the Debtor than the Purchase Agreement and (ii) has a value greater than or equal to the sum of (v) the amount of the Break-Up Fee, plus (w) the Expense Reimbursement, plus (x) the Overbid Amount (as defined below), plus (y) the consideration to the Debtor arising out of the Purchase Agreement, including, without limitation, the payment of the Purchase Price and the assumption of the Assumed Liabilities.

A Qualified Bid shall not consist of a credit bid by any creditor pursuant to section 363 of the Bankruptcy Code.

d) Bid Deadline.

Prior to the Bid Deadline, a Qualified Bidder that desires to make a bid shall simultaneously deliver copies of its bid via certified mail, courier, facsimile or email to: (i) Bender Shipbuilding & Repair Co., Inc., 265 Water Street, Mobile, AL 36601, Attn: Thomas B. Bender, Jr., bent@bendership.com; (ii) the Debtor's bankruptcy counsel, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, 601 Poydras Street, Suite 2775, New Orleans, LA 70130, Attn: Stewart F. Peck, Esq., speck@lawla.com; and (iii) Global Hunter Securities, LLC, 400 Poydras Street, Suite 1510, New Orleans, LA 70130, Attn: Michael H. Schmidt, mschmidt@ghsecurities.com. Upon receipt, the Debtor shall immediately distribute a copy of each such bid to (x) VTM and its counsel McKenna Long & Aldridge LLP, 303 Peachtree St., Suite 5300, Atlanta, GA 30308, Attn.: Jeremy C. Silverman, Esq., jsilverman@mckennalong.com, and (y) counsel to the Committee, Kelley Drye & Warren, LLC, 101 Park Avenue, New York, NY 10178, Attn: Craig Wolfe, Esq., cwolfe@kelleydrye.com, so as to be received not later than **5:00 p.m. (Central Time)** on Monday, January 11, 2010 (the "*Bid Deadline*").

e) Auction.

If one or more Qualified Bids (other than that of VTM) is received, the Debtor will conduct an auction (the "*Auction*") with respect to the Purchased Assets. If no Qualified Bid (other than that of VTM) is received by the Bid

Deadline, the Debtor shall report the same to the Bankruptcy Court, VTM's bid will be deemed the highest or otherwise best offer for the Purchased Assets, and the Debtor shall proceed with the transactions contemplated by the Purchase Agreement without holding the Auction. The Auction, if required, will commence at 9:00 a.m. (Central Time) on January 14, 2010,[5] at the offices of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, in New Orleans, Louisiana, or at such later time or other place as agreed by VTM and the Debtor, and of which the Debtor will notify all Qualified Bidders who have submitted Qualified Bids. The Auction shall be governed by the following procedures:

At least two (2) days prior to the Auction, the Debtor will provide to VTM and all other Qualified Bidders a copy of the highest or otherwise best Qualified Bid received and copies of all other Qualified Bids and a summary thereof. In addition, the Debtor will inform VTM and each Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Bidders that may participate in the Auction.

Only VTM, counsel for the Committee, the Debtor and any Qualified Bidders (and such parties' representatives and professionals) will be entitled to attend, participate and be heard at the Auction, and only VTM and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction. Each Qualified Bidder shall (i) appear in person at the Auction, or through a duly authorized representative and (ii) be required to confirm that it has not engaged in any collusion with respect to the bidding or the Transaction.

---

[5] Or such other date as is approximately three (3) days after the Bid Deadline.

During the Auction, bidding will begin at the purchase price stated in the highest or otherwise best Qualified Bid or Bids, plus the amount of the Break-Up Fee of $850,000.00 plus the Expense Reimbursement of up to $400,000.00 in documented third-party expenses, plus the minimum bidding increment of $250,000.00 (the "Overbid Amount"). Bidding will subsequently continue in additional minimum increments of an amount at least equal to the Overbid Amount. Any bid made by VTM at the Auction, if any, shall be deemed to include the Break-Up Fee of $850,000.00 plus the Expense Reimbursement of up to $400,000.00.

During the Auction, the Debtor shall inform each participant which Qualified Bid reflects, in the Debtor's view (after consultation with the Committee), the highest or otherwise best offer. To the extent that such bid has been determined to be the highest or otherwise best offer entirely or in part because of the addition, deletion or modification of a provision or provisions in the Purchase Agreement, or related ancillary agreement or, if applicable, in the Qualified Bid, other than an increase in the cash purchase price, the Debtor shall provide notice to each participant of the value ascribed by the Debtor to any such added, deleted or modified provision or provisions.

The bidding at the Auction shall be transcribed and all bids made at the Auction will be announced in the presence of all other Qualified Bidders at the time such bids are made. All Qualified Bidders shall be required to disclose at the Auction the identity of the person or entity on whose behalf its bid is being submitted. Bidding at the Auction will continue until such time as the highest or

otherwise best Qualified Bid is determined. Upon the conclusion of the Auction, the Debtor will review each Qualified Bid on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Transaction. BIDS MADE AFTER THE CLOSE OF THE AUCTION SHALL NOT BE CONSIDERED BY THE DEBTOR OR THE BANKRUPTCY COURT. The Debtor shall select, in consultation with the Committee, from among the Qualified Bids, and shall announce the Prevailing Bidder and the Second Highest Bidder at the conclusion of the Auction. In the event of any dispute concerning such selection, the Bankruptcy Court shall have the exclusive jurisdiction to adjudicate such matter. If the Prevailing Bidder is not VTM, the Prevailing Bidder shall be required to submit to the Debtor an executed revised purchase agreement upon which the Prevailing Bid was made within one (1) Business Day following the conclusion of the Auction.

f) <u>Sale Hearing</u>.

The Debtor requests that the Sale Hearing be scheduled for January 19, 2010. At the Sale Hearing, the Debtor will request entry of the Sale Order confirming the results of the Auction and approving the sale of the Purchased Assets to the bidder(s) who have made the Prevailing Bid (if no Qualifying Bid other than that of VTM is received, the Debtor will request that the Court approve the sale of the Purchased Assets to VTM on the terms set forth in the Purchase Agreement). The Sale Hearing may be adjourned from time to time without

further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

g) <u>Failure to Consummate Sale</u>. Following the Sale Hearing, if the Prevailing Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of the Prevailing Bidder, the next highest or otherwise best Qualifying Bid (the "*Second Highest Bid*"), as determined by the Debtor in the exercise of its business judgment, will be deemed to be the new Prevailing Bid, and the Debtor will be authorized, but not required, to consummate the sale with the new Prevailing Bidder by accepting such bid without further order of the Bankruptcy Court. Whether or not VTM is the Second Highest Bidder, VTM shall remain obligated to purchase the Purchased Assets in accordance with the Purchase Agreement, as modified by VTM's highest Bid at the Auction. In such case, the defaulting Prevailing Bidder's deposit, if any, shall be forfeited to the Debtor, and the Debtor specifically reserve the right to seek all available damages from the defaulting Prevailing Bidder, provided, however, that, the Buyer's Deposit shall be paid, returned or applied as set forth in the Purchase Agreement, and the Debtor's ability to seek damages from VTM shall be governed exclusively by the terms of the Purchase Agreement.

h) <u>Deposits</u>. Deposits made by Qualified Bidders shall be (1) maintained by the Debtor in a segregated account, escrow account or such other account as otherwise agreed to by the parties and (2) refunded by the Debtor in the event that such Qualified Bid is not the Prevailing Bid and which shall be credited towards the purchase price in the event such bid is the Prevailing Bid. Except as otherwise

23

provided in the Purchase Agreement, any Deposit made by a Qualified Bidder who is not the Prevailing Bidder pursuant to the Bidding Procedures shall be returned to such bidder within five (5) Business Days after entry of the Sale Order. Except as provided in the Purchase Agreement, the Deposit of the Second Highest Bid shall be retained by the Seller in escrow until five (5) Business Days following the consummation of the sale to the Prevailing Bidder, and the Qualified Bidder with respect to the Second Highest Bid will remain obligated to purchase all or part of the Purchased Assets in accordance with such bid until the consummation of the sale to the Prevailing Bidder.

i) Reservation of Rights

The Debtor may, in consultation with the Committee, (a) determine, in its business judgment, which Qualified Bid, if any, is the highest or otherwise best offer so long as such bidder has complied with the Bidding Procedures, and (b) reject any bid (other than that of VTM) that, in the Debtor's sole judgment, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtor, its estate and its creditors.

Nothing in the Bidding Procedures shall, or shall be deemed to amend, modify, limit or otherwise affect the terms or conditions of the Purchase Agreement, or the rights and remedies of the parties thereunder or under applicable bankruptcy law.

## The Proposed Sale Notice Package

21.     The Debtor shall serve the Notice Parties (as defined below) with a Sale Notice Package (as defined below) consisting of: (i) the approved Bidding Procedures Order (including a copy of the Bidding Procedures) and (ii) a proposed notice of sale (the "*Sale Notice*"), substantially in the form attached hereto as Exhibit E, which includes (a) the time and place of the Auction and the Sale Hearing, and (b) the time fixed for filing objections to the Sale (collectively, the "*Sale Notice Package*").

22.     The Sale Notice Package will be served upon the following entities at least **fifteen (15) days** prior to the Auction (collectively, the "*Notice Parties*"): (i) the Creditors' Committee, (ii) GECC, (iii) Marquette, (iv) counsel to VTM; (v) all known creditors of the Debtor, (vi) any party that has asserted or may have a lien and/or an interest in the Purchased Assets; (vii) any party that is reasonably known to the Debtor to be entitled to assert a lien against the Purchased Assets, (viii) all relevant federal, state and local regulatory or taxing authorities or recording offices that have the ability to impose a tax on or a charge or lien against the Purchased Assets, (ix) all Governmental Authorities with oversight of environmental or employee matters relating to the Debtor or the Debtor's business, (x) all non-Debtor parties to any executory contract or unexpired lease to which the Debtor is a party, including without limitation the Assigned Contracts, and (xi) any other party which the Debtor has determined, in its sole and absolute discretion, may have an interest in submitting a Qualified Bid.

23.     In addition, the Debtor also will publish a notice, substantially in the form of the Sale Notice in *The Wall Street Journal*, *The Press-Register*, *The Times-Picayune*, and *The Houston Chronicle* as often as is reasonable pursuant to each newspaper's

schedule for publication of legal notices over a period of not less than a ten (10) day period prior to the Auction.

## Consent of the Agent

24.     Pursuant to the terms of the proposed Bidding Procedures Order, if no objection is filed by the Agent to the relief sought in the Motion, or such objection or objections having been satisfied, the Agent shall be deemed to have consented to the relief sought in the Motion, including, without limitation, the entry of an order approving the sale to VTM following the Sale Hearing, and no further consent of any creditor of the Debtor is required.

## The Sale of the Purchased Assets Pursuant
## to the Purchase Agreement Should be Approved

25.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, a sale of a debtor's assets should be authorized when there is an articulated business justification for doing so. *See Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1994); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983).

26.     Whether a transaction has a sufficient articulated business justification depends on the facts of the case. *See In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). A bankruptcy court should consider "all salient factors pertaining

26

to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders alike." *Continental*, 780 F.2d at 1226; *Lionel*, 722 F.2d at 1071. Relevant factors may include: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition on the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value." *See Continental*, 780 F.2d at 1226; *Lionel*, 722 F.2d at 1071; *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Condere Corporation*, 228 B.R. 615, 628 (Bankr. S.D. Miss. 1998).

27.    Once a debtor has articulated a valid business justification, "a presumption [arises] that the officers and directors of a corporation, in making a business decision for that corporation, act only after they have been appropriately informed and after they have honestly determined that the action to be taken is in the best interest of the corporation." *In re Performance Nutrition, Inc.*, 239 B.R. 93, 111 (Bankr. N.D. Tex. 1999). When applying the "business judgment" standard, courts show deference to a debtor's business decisions. *See, e.g., In re Tom's Foods Inc.*, 2005 WL 3022022, *2 (Bankr. M.D. Ga. 2005) ("courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence") ; *Atkins v. Hibernia Corp.*, 182 F.3d 320, 324 (5th Cir. 1999); *GBL Holding Co. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Group, Ltd.)*, No. Civ. A. 3:04-CV-2411-M, 2009 WL 440379, *2 (N.D. Tex. Feb. 23, 2009) ("great judicial deference is given to [the debtor in possession's] exercise of business judgment").

27

28. In addition, the proposed sale to VTM is not a *sub rosa* plan of reorganization because it seeks only to liquidate assets and will not restructure the rights of creditors. *See Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223 (5th Cir. 1986); *PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir.), *reh'g denied*, 705 F.2d 450 (5th Cir. 1983); *see also In re Naron & Wagner, Chartered*, 88 B.R. 85 (Bankr. D. Md. 1988) (proposed sale is not a *sub rosa* plan because it seeks only to liquidate assets and will not restructure the rights of creditors).

29. The Debtor has determined that immediate consummation of the sale is the best way to maximize the value of the Debtor's estate for the benefit of all constituencies.

30. In addition, a delay of the Sale would result in a continued default under the Replacement Financing Agreement.

31. Moreover, attempting to complete a sale pursuant to a Chapter 11 plan would be an inherently longer process, resulting in a significant risk that the price a willing buyer may pay for the Debtor's assets, in view of expected continuing losses, would deteriorate, to the detriment of all of the Debtor's creditors. Moreover, delay of the sale may very well provoke VTM to terminate the Purchase Agreement, resulting in an alternative outcome that may yield far less value for the Debtor, its estate and its creditors.

32. In satisfying the requirement of the Replacement Financing Agreement, a sale of the Purchased Assets will provide the Debtor with the ability to pay down a substantial amount of secured debt.

33.     As explained above, the Debtor, through Global Hunter, undertook a thorough marketing process in order to obtain the highest and best price for the Purchased Assets.  In addition, to confirm that VTM's offer is the best possible purchase price for the Purchased Assets, VTM's bid will be tested through the Bidding Procedures and the Auction process (as described previously), which are consistent with the requirements of the Bankruptcy Code and Bankruptcy Rules.  Consequently, the fairness and reasonableness of the consideration to be paid by VTM ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process, which are the best means for establishing whether a fair and reasonable price is being paid.

34.     Based on the foregoing, the Debtor has determined in its sound business judgment that the sale of the Purchased Assets on the terms and conditions set forth in the Purchase Agreement and pursuant to the Bidding Procedures is fair and reasonable and in the best interest of the Debtor's estate, its creditors, and all parties in interest in the Debtor's Chapter 11 case.

### Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

35.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(i) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(ii) such entity consents;

(iii) such interest is a lien and the price at which the property is sold is greater than all liens on such property;

29

(iv) such interest is in bona fide dispute; or

(v) such entity could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such interest.

36.     To facilitate the sale of the Purchased Assets, the Debtor requires authorization to sell them free and clear of any and all liens, claims, encumbrances, or interests, with any such liens, claims, encumbrances, or interests to attach to the net proceeds of the sale with the same rights and priorities therein. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements is sufficient to permit the sale to be free and clear of all liens, claims, encumbrances, and interests (each, an "*Interest*", and collectively, the "*Interests*"). Here, a "free and clear" sale is warranted because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code will be satisfied. Those holders of Interests who do not object, or who withdraw its objections to the sale or the Motion, will be deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

37.     Those holders of Interests who do object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having its Interests, if any, attach to the cash proceeds of the sale ultimately attributable to the property against or in which they claim an Interest. Accordingly, the Debtor requests that the assets be sold to VTM (or other successful bidder at auction) free and clear of all liens, claims, and encumbrances, with such liens, claims and encumbrances to attach to the proceeds of the sale.

### **Good Faith Purchaser**

38. Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

39. The terms and conditions of the Purchase Agreement were negotiated by the Debtor and VTM at arm's length and in good faith. VTM does not hold any interest in the Debtor and is not otherwise affiliated with the Debtor or its officers or directors. Moreover, VTM is not an "insider" of any of the Seller within meaning of section 101(31) of the Bankruptcy Code, and is not controlled by, or acting on behalf of, any insider of the Seller. *See, e.g., In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) (good faith found where officers, directors and employees of debtor had no apparent connection to purchasers). Alternatively, the Debtor commits to negotiate any alternative bid at arm's length and in good faith within the meaning of section 363(m). *See, e.g., In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 515 (Bankr. N.D. Al. 2002) (good faith found where all negotiations and bidding occurred at arm's length). The Debtor will present evidence at the Sale Hearing to prove the foregoing. Accordingly, the Debtor requests that the Court determine VTM or, to the extent applicable, an alternative bidder, to be acting in good faith and entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

**Assumption and Assignment of Certain**
**Executory Contracts and Unexpired Leases**

40.     The Purchase Agreement provides that VTM will also purchase, pursuant to the terms of the Purchase Agreement, those executory contracts and unexpired leases to be designated by VTM. In connection therewith, the Debtor seeks to assume and assign the Assigned Contracts pursuant to 11 U.S.C. §365(a) and Fed. R. Bankr. Proc. 6006 ("*Motion*").

41.     Pursuant to 11 U.S.C. §365(a), the Debtor, as debtor-in-possession, may assume any executory contract or unexpired lease of the Debtor, subject to this Court's approval of the assumption. The Court should approve the assumption by the Debtor of a lease or an executory contract if such assumption is made in the exercise of the Debtor's sound business judgment, and if such assumption benefits the Debtor's estate. *See, e.g. Sharon Steel Corp. V. National Fuel Gas Distr. Corp.*, 872 F.2d 36, 39 (3rd Cir. 1989); *In re Bildisco*, 682 F.2d 72, 79 (3rd Cir. 1982), *aff'd* 465 U.S. 513 (1984); *In re Patterson*, 119 B.R. 59 (Bankr. E.D. Pa. 1990). It is enough if the Debtor determines in its business judgment that a benefit will be realized. *Sharon Steel Corp.*, 872 F.2d at 39 (*citing In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)). The business judgment standard requires that the Court approve the Debtor's business decision unless that judgment is the product of bad faith, whim or caprice. *Lubrizol Enterprises v. Richmond Metal Finishes*, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied 475 U.S. 1057 (1986).

42.     Section 365(b) of the Bankruptcy Code requires that a debtor in possession meet certain additional requirements to assume a lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

Case 09-12616   Doc 617   Filed 12/15/09   Entered 12/15/09 10:23:39   Desc Main
                          Document       Page 32 of 45

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).  This section does not apply to a default that is a breach of a provision relating to:

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title;

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

*Id.* § 365(b)(2).

## Establishing Cure Costs For Purchased Contracts

43.     Section 365(b)(1) of the Bankruptcy Code requires that the Debtor cure, or provide adequate assurance that it will promptly cure, any outstanding defaults under the Assigned Contracts in connection with the assumption and assignment of these agreements to Buyer (the "*Cure Costs*"). The Debtor will be providing notice of the Cure Costs to all parties to the Assigned Contracts (the "*Cure Notice*") at least **twenty (20)** days before the Sale Hearing.  Any objection to the Cure Costs must be in writing, filed with the Court, and actually received by the Debtor, its attorneys and professionals and

the attorneys for VTM (as will be set forth in the Cure Notice) no later than no later than Friday, January 15, 2010 at 5:00 p.m. (Central Time), and must state with specificity the nature of such objection and the alleged Cure Cost (with appropriate documentation in support thereof). If an objection to a Cure Cost is timely filed and served, the Debtor may schedule a hearing to consider such objection in the event it cannot be resolved among the parties, which hearing may be the Sale Hearing. **If no objection to the Cure Cost for a particular Purchased Contract is timely filed and served, the Cure Cost set forth in the Notice shall be binding upon the respective non-Debtor party to the Purchased Contract, and the respective non-Debtor party shall be forever barred from objecting to the Cure Cost set forth in the Cure Notice, including, without limitation, the right to assert any additional cure or other amount with respect to its respective Purchased Contract.** In the event one or more Assigned Contracts are added to the Purchase Agreement on or before the Closing or in connection with any Competing Transaction, as applicable (each, an *"Additional Purchased Contract"*), the Debtor will serve an additional notice on the non-Debtor parties to such Additional Assigned Contracts, and such non-Debtor parties shall have twelve (12) days thereafter to object to the Cure Cost, unless such period is shortened by the Court, provided, however, that each of the Debtor and the Buyer (or the Prevailing Bidder) hereby reserves its right to remove any of the Assigned Contracts (including any Additional Assigned Contracts, the *"Removed Contracts"*) from the Purchase Agreement until the Closing. In the event that any Assigned Contracts previously included in the Purchase Agreement are removed, the Debtor will serve notice on the non-Debtor parties to such Removed Contracts.

Case 09-12616   Doc 617   Filed 12/15/09   Entered 12/15/09 10:23:39   Desc Main
Document   Page 34 of 45

44.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in possession may assign an executory contract or unexpired lease of nonresidential real property if

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*Id.* § 365(f)(2).

45.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See In re Tex. Health Enterprises, Inc.*, 246 B.R. 832, 843 (Bankr. E.D. Tex. 2000) (internal quotations omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

46.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and has expressed willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

47. The Debtor will present evidence at the Sale Hearing to prove the financial credibility, willingness, and ability of VTM or any successful bidder to perform under the Assigned Contracts. The Sale Hearing thus will provide the Court and other interested parties the opportunity to evaluate the ability of VTM or any other successful bidder to provide adequate assurance of future performance under the Assigned Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code. Accordingly, the Debtor requests that the Court grant authorization to assume and assign the Assigned Contracts to VTM or the successful bidder.

## Approval Of The Bidding Procedures Is Warranted

48. It is well established that break-up fees and expense reimbursements may be approved in a bankruptcy case. *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.* (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989); *In re Kitty Hawk, Inc.*, No. 400-42069, 2003 Bankr. LEXIS 859 (Bankr. N.D. Tex. July 29, 2003); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that its first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

49. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., Integrated Resources*, 147 B.R. at 659. Generally, courts will approve such fees as long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. *See id.* (explaining that such procedures "encourage bidding and maximize the value of the debtor's assets"); *In re Financial News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court imposed rules for the disposition of assets. . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

50. The Break-Up Fee and Expense Reimbursement is beneficial to the Debtor's estate and creditors because they provide incentive for a potential stalking horse bidder (such as VTM) to agree to a higher and better stalking horse bid prior to the Auction than it might otherwise be prepared to do in the absence of such protections. To the extent bids can be improved prior to the Auction, a higher floor is established for further bidding at the Auction. Thus, even if VTM ultimately is not the successful bidder, the Debtor and its estate will have benefited from the higher floor established by the Purchase Agreement. *See, e.g., In re Wintex, Inc.*, 158 B.R. 540, 543 (D. Mass. 1992) ("A debtor may avoid the increased costs and complexity associated with considering additional bids unless the additional bids are high enough to justify its pursuit. The 10%

increase requirement is one example of a reasonable litmus test."); *In re Colony Hill Associates*, 111 F.3d 269 (2d Cir. 1997) (requiring minimum overbids to exceed purchaser's initial offer of $7.5 million by at least $650,000, or 8.6%); *In re Tempo Technology Corp.*, 202 B.R. 363, 369 (D. Del. 1996) (requiring minimum overbids of $1,400,000 in cash where original purchase price was $150,000 cash plus $3 million in stock of the purchaser and $500,000 of assumed liabilities).

51.     The Break-Up Fee and Expense Reimbursement, was negotiated at arm's length, should be approved because (i) they are reasonable in relation to the size of the proposed sale, (ii) they do not hamper any other party from offering a higher or better bid, and (iii) extensive work was undertaken and expense incurred by VTM in investigating, negotiating, and drafting the Purchase Agreement and related documents, all of which will facilitate the sale of the Purchased Assets in a favorable and expeditious manner.

52.     Additionally, the prohibition against allowing a secured creditor to credit bid at the Auction pursuant to section 363(k), as set forth in the Bidding Procedures, is warranted under the circumstances. Pursuant to section 363(k), the Court may deny a secured creditor's right to credit bid "for cause." 11. U.S.C. § 363(k). Here, the assets being sold are an amalgamation of assets in which various creditors claim liens. Selling these assets together, rather than allowing them to be divided and distributed among various secured creditors, will undoubtedly bring a higher value to the estate.

53.     Further, section 363(k) requires that the creditor have an "allowed claim" in order to credit bid. The potential claims at issue with respect to the assets proposed to be sold have not yet been deemed allowed. Moreover, a court may deny a creditor the

right to credit bid, where the liens at issue are in bonafide dispute. *See, e.g., In re Akard Street Funds*, 2001 WL 1568332 (N.D. Tex. Dec. 4, 2001)(Not reported in F. Supp. 2d)(holding that a bankruptcy court acts properly when it denies a creditor the right to credit bid where liens are in bonafide dispute, the rapid sale of the assets is necessary to prevent a sharp decline in the value of the estate, and a comparatively lengthy period of time will be necessary to resolve the complex dispute that surrounds the challenged liens); see also *National Bank of Commerce of El Dorado v. L.D. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that a creditor would not be entitled to credit bid any of its alleged liens or security interests at a sale because the validity of the creditor's liens was unresolved."). The claims at issues with respect to the Purchased Assets are currently being analyzed by the Committee.

54.     The Debtor submits that the Bidding Procedures are in the best interests of the Debtor, its estate and its creditors because they will enable the Debtor to realize the maximum value from the sale of the Purchased Assets. The Auction is designed to generate interest and bidding, thereby yielding the highest and best offers for the Assets. Finally, the Bidding Procedures include appropriate noticing procedures to ensure all parties in interest will receive adequate notice of all relevant information.

55.     Here, the Break-Up Fee is $850,000, which is only 4% of VTM's proposed $21,000,000 purchase price for the Purchased Assets. Additionally, despite engaging in extensive marketing efforts and in negotiations with other parties regarding purchasing the Purchased Assets, the Debtor has been unable to obtain an agreement on terms more favorable than those set forth in the Purchase Agreement. The Debtor submits that such Break-Up Fee is more than reasonable under the circumstances and is wholly

supported by the applicable law. *See, e.g.,* In *re Monaco Coach Corp.*, Ch. 11 Case No. 09-10750-KJC, slip op. at 5 (Bankr. D. Del. May 1, 2009)(approving breakup fee of $1,250,000 and expense reimbursement of $1,750,000, which constituted 5.7 percent of the aggregate purchase price of $52,000,000); *In re Lehman Brothers Holdings, Inc.,* Ch. 11 Case No. 08-13555 (JMP), slip op. at 6-7 (Bankr. S.D.N.Y. Sept. 17, 2008)(approving breakup fee of $100,000,000 and expense reimbursement of $25,000,000, which constituted 7.3 percent of the aggregate purchase price of $1,700,000,000); *In re Parmalat USA Corp.,* Ch. 11 Case No. 04-11139, slip op. at 4-5 (Bankr. S.D.N.Y. Aug. 5, 2004)(approving breakup fee of $600,000 and expense reimbursement of $300,000, which constituted 4.6 percent of the aggregate purchase price of $19,700,000); *Financial News Network,* 980 F.2d at 167 (noting that the transaction at issue provided for $8.2 million break-up fee on the $149.3 million transaction; approximately 5.5%).

56.     The Expense Reimbursement is also fair under the circumstances. The Expense Reimbursement will compensate VTM for those "reasonable" and "actual" expenses incurred by the Buyer in investigating, negotiating, and drafting the Purchase Agreement and related documents. The requirement that any expenses reimbursed by the Debtor be "actual" and "reasonable," provide further assurance that the Expense Reimbursement paid to VTM is reasonable and commensurate with the value of the Purchased Assets.

57.     VTM's willingness to commit to the sale transaction, to continue to perform the activities necessary to consummate the transaction, and to serve as a "stalking horse" against which other prospective purchasers will be compared in and of itself represents a significant contribution to the Debtor's estate. As a result, by agreeing

to pay the Break-Up Fee which includes Expense Reimbursement, the Debtor ensures that its estate will receive the benefit of VTM's initial offer without sacrificing the potential for interested parties to submit more favorable bids at the Auction.

## Need for Immediate Effect of Order and Without Stay

58.     Bankruptcy Rules 6004(h) and 6006(d) respectively provide that an order authorizing the use, sale, or lease of property and an order authorizing the assumption and assignment of executory contracts or unexpired leases will be stayed for ten days after entry of such approval orders unless the court orders otherwise. As set forth above, a delay of the Sale would result in a continued default under the Replacement Financing Agreement. Additionally, the Debtor has immediate need for the proceeds of the Sale. .Therefore, the Debtor requests that the Court direct that the order approving this Motion shall not be automatically stayed for ten days.

## Notice

59.     Notice of this Motion has been provided to (i) the Creditors' Committee, (ii) GECC, (iii) Marquette, (iv) counsel to VTM; (v) all known creditors of the Debtor, (vi) any party that has asserted or may have a lien and/or an interest in the Purchased Assets; (vii) any party that is reasonably known to the Debtor to be entitled to assert a lien against the Purchased Assets, (viii) all relevant federal, state and local regulatory or taxing authorities or recording offices that have the ability to impose a tax on or a charge or lien against the Purchased Assets, (ix) all Governmental Authorities with oversight of environmental or employee matters relating to the Debtor or the Debtor's business, and (x) any other party which the Debtor has determined, in its sole and absolute discretion,

may have an interest in submitting a Qualified Bid. The Debtor submits that no other or further notice need be provided.

**[Remainder of page intentionally left blank]**

60. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and such other and further relief as is just and proper.

Dated: December 15, 2009
New Orleans, Louisiana

LUGENBUHL, WHEATON,
PECK,RANKIN & HUBBARD

Stewart F. Peck, *pro hac vice*
Christopher T. Caplinger, *pro hac vice*
Benjamin W. Kadden, *pro hac vice*
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
Email: speck@lawla.com;
     ccaplinger@lawla.com;
     bkadden@lawla.com

AND

IRVIN GRODSKY
P.O. Box 3123
Mobile, AL 36652
Telephone: (251) 433-3657

*Attorneys for the Debtor*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Motion of the Debtor Pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004 and 6006 for an Order (A) Approving the Sale of Certain Assets, and Assignment of Certain Contracts, to VTM or Other Successful Bidder(s) at Auction, Free and Clear of All Liens, Claims, Encumbrances and Interests; (B) Approving Bidding Procedures and Bid Protections (Including Break-Up Fee and Expense Reimbursement); and (C) Approving the Form and Manner of Notice Thereof has been served upon the parties receiving CM/ECF, including parties appearing and requesting service, and upon the individuals listed on the attached service list, by depositing a copy of same in the United States mail, properly addressed, and first class postage prepaid, this 15th day of December 2009.

Case 09-12616   Doc 617   Filed 12/15/09   Entered 12/15/09 10:23:39   Desc Main
Document       Page 44 of 45

Job Crafters, Inc.
701 Royal Street
Mobile, AL 36603

B&D Contracting
1308 Pass Road
Gulfport, MS 39501

Schottel GMBH
Mainzer Str. 99
D-56322, Spay/Rhein GERMANY

Gulf Offshore Logistics
120 White Rose Drive
Raceland, LA 70375

Waterways Towing & Offshore Svs.
P.O. Box 1821
Mobile, Al 36633-1821

Ranger Steel Supply Corp.
P.O. Box 4346, Dept. 451
Houston, TX 77210-4346

Metals USA, Inc.
P.O. Box 2763
Mobile, AL 36652

Jamestown Metal Marine Sales, Inc.
4710 Northwest Second Ave.
Boca Raton, FL 33431

Rap, LLC
P.O. Box 1444
Mobile, AL 36633

American Express
P.O. Box 650448
Dallas, TX 75265-0448

New Industries, Inc./New Offshore
P.O. Box 2176
Morgan City, La 70381-2176

Rock Cable, Inc.
103 Sandhill Ct.
Fairhope, Al 36532

CE, LLC
P.O. Box 1864
Mobile, AL 36633

United Rentals
1413 Montlimar Dr.
Mobile, AL 36609

Transmontaigne Product Service. Inc.
P.O. Box 3064
Mobile, Al 36652

Southern Gas & Supply, Inc
5500 East Rite Road
Theodore, AL 36582

Donovan Marine, Inc.
6316 Humphreys St.
Harahan, LA 70132

Technology Ventures Middle East FZC
P.O. Box 9252 Saif Zone
Sharjah, U.A.E.

Marine & Industrial Supply
P.O. Box 2186
Mobile, AL 36652

Seabulk Towing
P.O. Box 930127
Atlanta, GA 31193-0127

Louis A. Curcio
Sonnenschein Nath & Rosenthal
1221 Avenue of the Americas
New York, NY 10020-1089

Travis Bedsole, Bktcy. Administrator
182 St. Francis Street, Suite 100
Mobile, AL 36602

GulfMark Offshore, Inc.
c/o Bruce A Streeter, President & CEO
10111 Richmond, Suite 340
Houston, TX 77042

Maritrans Operating Company, L.P.
Two Harbour Place
302 Knights Run Avenue
Tampa, FL 36602

American Express Travel Related Svs.
c/o Becket and Lee LLP
P.O. Box 3001
Malvern, PA 19355-0701