# AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

by and between

## BENDER SHIPBUILDING & REPAIR CO., INC.,
as the Seller

and

## VISION TECHNOLOGIES MARINE, INC.,
or its Assigns, as the Purchaser

**Dated as of December 30, 2009**

# TABLE OF CONTENTS

Page

Article I      DEFINITIONS.................................................................................... 1

    Section 1.01      Definitions.................................................................... 1

    Section 1.02      Interpretation and Rules of Construction........................... 12

Article II      PURCHASE AND SALE ............................................................. 13

    Section 2.01      Purchase and Sale of Assets........................................... 13

    Section 2.02      Assumption and Exclusion of Liabilities and Obligations ............... 14

    Section 2.03      Purchase Price............................................................. 16

    Section 2.04      Payment of the Purchase Price......................................... 16

    Section 2.05      Allocation of the Purchase Price....................................... 17

    Section 2.06      Missing Property Reduction ............................................ 17

    Section 2.07      Purchaser's Deposit. ..................................................... 18

    Section 2.08      Reserved..................................................................... 18

    Section 2.09      Cure Costs .................................................................. 18

    Section 2.10      Closing ...................................................................... 19

    Section 2.11      Closing Deliveries by the Seller ...................................... 19

    Section 2.12      Closing Deliveries by the Purchaser .................................. 20

    Section 2.13      Closing Documents; Transfers of Real Property ................... 21

Article III      REPRESENTATIONS AND WARRANTIES OF THE SELLER ................... 22

    Section 3.01      Organization, Authority and Qualification of the Seller;
                      Enforceability.............................................................. 22

    Section 3.02      No Conflict.................................................................. 22

    Section 3.03      Governmental Consents and Approvals.............................. 23

    Section 3.04      Litigation.................................................................... 23

    Section 3.05      Compliance with Laws .................................................. 23

    Section 3.06      Real Property Interests.................................................. 23

    Section 3.07      Tangible Personal Property............................................. 24

    Section 3.08      Intellectual Property..................................................... 24

    Section 3.09      Permits and Licenses.................................................... 24

    Section 3.10      Employee Benefits ....................................................... 24

    Section 3.11      Employee Controversies ................................................ 26

ATLANTA:5199621.1

Case 09-12616    Doc 667-1    Filed 12/30/09    Entered 12/30/09 16:33:18    Desc
Exhibit B    Page 2 of 62

Section 3.12        Labor ................................................................................................ 26

Section 3.13        Taxes ................................................................................................ 27

Section 3.14        Material Contracts ............................................................................ 27

Section 3.15        Environmental Matters ..................................................................... 28

Section 3.16        Insurance Policies ............................................................................ 29

Section 3.17        Sufficiency of Rights ....................................................................... 29

Section 3.18        Brokers ............................................................................................. 29

Section 3.19        Full Disclosure ................................................................................ 29

Section 3.20        Disclaimer of the Seller ................................................................... 29

Article IV        REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............ 30

Section 4.01        Organization and Authority of the Purchaser; Enforceability .......... 30

Section 4.02        No Conflict ....................................................................................... 30

Section 4.03        Governmental Consents and Approvals ........................................... 31

Section 4.04        Litigation ......................................................................................... 31

Section 4.05        Brokers ............................................................................................. 31

Section 4.06        Independent Investigation ................................................................ 31

Section 4.07        Financial Capabilities ...................................................................... 31

Article V        ADDITIONAL AGREEMENTS ................................................................. 32

Section 5.01        Bankruptcy Court Approvals ........................................................... 32

Section 5.02        Bidding Procedures .......................................................................... 32

Section 5.03        Transaction Approval Order ............................................................. 32

Section 5.04        Appeal .............................................................................................. 33

Section 5.05        Break-Up Fee ................................................................................... 33

Section 5.06        Assumption of Assigned Contracts .................................................. 33

Section 5.07        Conduct of Business Prior to the Closing ........................................ 34

Section 5.08        Access to Information ....................................................................... 34

Section 5.09        Damage or Destruction .................................................................... 35

Section 5.10        Confidentiality ................................................................................. 36

Section 5.11        Regulatory and Other Authorizations; Notices and Consents .......... 36

Section 5.12        Permits and Licenses ....................................................................... 37

Section 5.13        Retained Names and Marks .............................................................. 37

Section 5.14        Bulk Transfer Laws .......................................................................... 37

Section 5.15        Further Action .................................................................................. 37

ATLANTA:5199621.1

Section 5.16     Tax Cooperation and Exchange of Information...................................38

Section 5.17     Payment of Taxes....................................................................38

Section 5.18     Proration of Taxes and Certain Charges ............................................38

Section 5.19     Personal Information.................................................................39

Section 5.20     Reserved.............................................................................39

Section 5.21     Work in Progress.....................................................................39

Section 5.22     Additional Easements and Shared Utilities.......................................39

Section 5.23     Reserved.............................................................................40

Section 5.24     Location of Purchased Assets ......................................................40

Section 5.25     Removal of Excluded Assets .......................................................40

Section 5.26     Vehicle Registration.................................................................41

Section 5.27     Grant of Licenses ...................................................................41

Section 5.28     Complete Equipment ...............................................................43

Section 5.29     Acquisition/Lease of Additional Yards ...........................................43

Section 5.30     Bender Noncompetition and Consulting Agreement.........................44

Article VI       EMPLOYEE MATTERS...............................................................45

Section 6.01     Employees...........................................................................45

Section 6.02     Employee Plans......................................................................45

Section 6.03     Labor Contracts.....................................................................45

Section 6.04     WARN Act...........................................................................45

Section 6.05     COBRA Obligations .................................................................46

Section 6.06     Payment and Expenses at Closing ..................................................46

Section 6.07     Employee Access and Records ......................................................46

Article VII      CONDITIONS TO CLOSING ........................................................46

Section 7.01     Conditions to Obligations of the Seller.............................................46

Section 7.02     Conditions to Obligations of the Purchaser ........................................47

Article VIII     TERMINATION, AMENDMENT AND WAIVER .........................................50

Section 8.01     Termination..........................................................................50

Section 8.02     Effect of Termination ...............................................................51

Article IX       NON-SURVIVAL OF REPRESENTATIONS AND WARRANTIES ..............51

Section 9.01     Non-Survival of Representations and Warranties...........................51

Article X        GENERAL PROVISIONS .............................................................51

Section 10.01    Expenses ............................................................................51

ATLANTA:5199621.1

Case 09-12616   Doc 667-1   Filed 12/30/09   Entered 12/30/09 16:33:18   Desc
Exhibit B   Page 4 of 62

| | | |
|---|---|---|
| Section 10.02 | Notices | 52 |
| Section 10.03 | Public Announcements | 53 |
| Section 10.04 | Severability | 53 |
| Section 10.05 | Entire Agreement | 53 |
| Section 10.06 | Assignment | 53 |
| Section 10.07 | Amendment | 54 |
| Section 10.08 | Waiver | 54 |
| Section 10.09 | No Third Party Beneficiaries | 54 |
| Section 10.10 | Liquidated Damages | 54 |
| Section 10.11 | Governing Law | 54 |
| Section 10.12 | Waiver of Jury Trial | 55 |
| Section 10.13 | Counterparts | 55 |

Disclosure Schedule

| | | |
|---|---|---|
| Section 2.01(a)(i)(A) | - | Owned Real Property |
| Section 2.01(a)(i)(B) | - | Leased Real Property |
| Section 2.01(a)(i)(C) | - | Yard Diagram |
| Section 2.01(a)(ii) | - | Tangible Personal Property |
| Section 2.01(a)(viii) | - | Certain Intellectual Property |
| Section 3.02 | - | Conflicts |
| Section 3.03 | - | Governmental Consents and Approvals |
| Section 3.04 | - | Litigation |
| Section 3.05 | - | Compliance with Law Disclosure |
| Section 3.06(a) | - | Owned Real Property Exceptions |
| Section 3.07 | - | Dry Dock Registrations |
| Section 3.08 | - | Intellectual Property |
| Section 3.09 | - | Permits and Licenses |
| Section 3.10(a) | - | Employee Plans |
| Section 3.11 | - | Employee Controversies |
| Section 3.12(b) | - | Labor Matters |
| Section 3.13(a) | - | Tax Exceptions |
| Section 3.14(a) | - | Material Contracts |
| Section 3.14(b) | - | Material Contract Exceptions |
| Section 3.15 | - | Environmental Matters |
| Section 3.16 | - | Insurance Policies |
| Section 5.07 | - | Conduct of Business |
| Section 7.02(i) | - | Required Permits and Licenses |

ATLANTA:5199621.1

Case 09-12616    Doc 667-1    Filed 12/30/09    Entered 12/30/09 16:33:18    Desc
Exhibit B    Page 5 of 62

Exhibits

| | | |
|---|---|---|
| Exhibit A | - | Bill of Sale and Instrument of Assignment of Assets and Assumption of Liabilities |
| Exhibit B | - | Deposit Escrow Agreement |
| Exhibit C | - | Asserted Cure Costs Escrow Agreement |
| Exhibit D | - | Form of Bidding Procedures Order |
| Exhibit E | - | Form of Transaction Approval Order |
| Exhibit F | - | Form of Affiliate Lease |
| Exhibit G | - | Facilities Use Agreement |
| Exhibit H | - | CSX Property |

ATLANTA:5199621.1

Case 09-12616    Doc 667-1    Filed 12/30/09    Entered 12/30/09 16:33:18    Desc
Exhibit B    Page 6 of 62

This **AMENDED AND RESTATED ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of December 30, 2009, is made by and between **Bender Shipbuilding & Repair Co., Inc.**, a corporation organized under the laws of the State of Alabama (the "Seller"), and **Vision Technologies Marine, Inc.,** a corporation organized under the laws of the State of Delaware (or its assigns, the "Purchaser").

RECITALS

WHEREAS, the Seller is engaged in the business (the "Business") of shipbuilding and ship repair operations at the Owned Real Property and the Leased Real Property (each as defined below);

WHEREAS, the Seller is the debtor in a bankruptcy case pending in the United States Bankruptcy Court for the Southern District of Alabama (the "Bankruptcy Court"), styled as Chapter 11 Case No. 09-12616-MAM (the "Chapter 11 Case");

WHEREAS, the Purchaser and the Seller previously entered into that certain Asset Purchase Agreement dated December 14, 2009 (the "Original Agreement"), pursuant to which the Purchaser would purchase and acquire certain assets and assume certain liabilities from the Seller;

.WHEREAS, the Purchaser and the Seller now desire to amend and restate the terms and conditions upon which the Purchaser would purchase and acquire certain assets and assume certain liabilities from the Seller (provided that this amendment and restatement shall not modify or have any other effect on the Schedules and Exhibits to the Original Agreement);

WHEREAS, in connection with the Chapter 11 Case, subject to the terms and conditions contained herein and following the entry of the Transaction Approval Order, the Seller wishes to sell, assign and transfer to the Purchaser, and the Purchaser wishes to purchase and acquire from the Seller, the Purchased Assets and, in connection therewith, the Purchaser is willing to assume the Assumed Liabilities, all upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the Seller and the Purchaser hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01     Definitions.  For purposes of this Agreement:

"Action" means any claim, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority and any contested matter or adversary proceeding pending in the Chapter 11 Case.

"Additional Yards" has the meaning given to it in Section 5.29(b).

"Affected Assets" has the meaning given to it in Section 5.09(a)(i).

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Affiliate Leases" means, collectively, (i) that certain Ground Lease dated February 24, 2004, by and between RAP, LLC, as landlord, and the Seller, as tenant related to the property commonly known as Plot A - 651 Royal Street (North Baldwin) including any related lease or sublease arrangement between and among CSX Transportation, Inc., RAP, LLC and the Seller, (ii) that certain Facility Lease dated January 1, 2007, by and between Bender Ship Repair Company, Inc., as landlord, and the Seller, as tenant, related to the property commonly known as Yard 4, and (iii) that certain Lease dated November 1, 2001, by and between Complete Equipment, Inc., as landlord, and the Seller, as tenant, related to the property commonly known as Yard 12.

"Affiliate Sites" means the Leased Real Property that is subject to the Affiliate Leases.

"Agreement" has the meaning given to it in the Preamble.

"Ancillary Agreements" means the Bill of Sale, the Deeds, the Assignments and Amendments of Leasehold Rights, the Deposit Escrow Agreement, the Asserted Cure Costs Escrow Agreement, escrow instructions and the Facilities Use Agreement; settlement statements and other documents required by the Title Company to transfer the Owned Real Property and to issue title insurance for the Owned Real Property and Leased Real Property; signed escrow instructions by the Title Company, and such other documents or instruments of transfer and conveyance as may reasonably be requested by the Purchaser, each in form and substance reasonably acceptable to the Purchaser and the Seller, the terms of which shall be fully consistent with this Agreement.

"Asserted Cure Costs" means, in the aggregate, all Cure Costs asserted by any counterparty to an Assigned Contract that, as of two (2) Business Days prior to the Closing Date, are not Determined Cure Costs.

"Asserted Cure Costs Deposit" has the meaning given to it Section 2.09(a).

"Asserted Cure Costs Escrow Agreement" has the meaning given to it Section 2.09(a).

"Assigned Contract" means (i) any Material Contract and (ii) any other Contract pertaining to the Purchased Assets or the Business with respect to which the Purchaser notifies the Seller in writing on or prior to the date of the Bankruptcy Court hearing on the Bid Procedures Motion that the Purchaser desires to be included as an Assigned Contract hereunder, including, but not limited to, any deposits delivered to a counterparty by the Seller in connection therewith, that (a) does not become an Excluded Contract pursuant to Section 5.06(a), or (b) that is not deemed an Excluded Asset by operation of Section 2.01(b)(vi).

"Assigned Permit and License" means any Permit and License that does not become an Excluded Contract pursuant to Section 5.06(a).

2

"Assignments and Amendments of Leasehold Rights" means each Assignment and Amendment of Leasehold Rights to be executed by the Seller and each respective landlord at the Closing with respect to all Leased Real Property, each in form and substance satisfactory to the Purchaser, including without limitation the Yard 4 Lease, the Yard 12 Lease, the Plot A Lease and the lease assignments and amendments pertaining to the Additional Yards.

"Assumed Liabilities" has the meaning given to it in Section 2.02(a).

"Auction" means an auction to be conducted by Seller pursuant to the Bidding Procedures Order.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" has the meaning given to it in the Recitals.

"Bankruptcy Estate" has the meaning given to it in Section 2.01(b)(vii).

"Bid" has the meaning given to it in Exhibit D.

"Bidding Procedures" has the meaning given to it in Section 5.02.

"Bidding Procedures Order" has the meaning given to it in Section 5.01.

"Bill of Sale" means the Bill of Sale and Instrument of Assignment of Assets and Assumption of Liabilities to be executed by the Seller at the Closing, substantially in the form of Exhibit A.

"Break-Up Fee" has the meaning given to it in Section 5.05.

"Business" has the meaning given to it in the Recitals.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in Mobile, AL.

"CEI" has the meaning given to it in Section 5.28

"CEI Equipment" has the meaning given to it in Section 5.28.

"CEI Equipment Leases" has the meaning given to it in Section 5.28

"CEI Order" has the meaning given to it in Section 5.28.

"Chapter 11 Case" has the meaning given to it in the Recitals.

"Closing" has the meaning given to it in Section 2.10.

"Closing Date" has the meaning given to it in Section 2.10.

"Compensable Termination Event" has the meaning given to it in Section 5.05.

3

"Confidentiality Agreement" has the meaning given to it in Section 5.10(a).

"Contracts" means any arrangement, note, bond, commitment, franchise, guarantee, indemnity, indenture, instrument, lease, license or other agreement, understanding, instrument or obligation, whether written or oral, all amendments, supplements and modifications of or for any of the foregoing and all rights and interests arising thereunder or in connection therewith.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Controlled Group" means any trade or business under common control within the meaning of ERISA Section 4001(b)(1) with the Seller, or that together with the Seller is treated as a single employer under Section 414 of the Tax Code.

"Conveyance Taxes" means all sales, use, value added, transfer, stamp, stock transfer, real property transfer or gains and similar Taxes.

"Cure Costs" has the meaning given to it in Section 5.06(c).

"Cure Determination Date" has the meaning given to it in Section 5.27(b)(ii).

"Deed" means, with respect to each parcel of Owned Real Property, the transfer of the Owned Real Property by general warranty deed to be executed by the Seller at the Closing in order to convey to the Purchaser the Seller's right, title and interest in such parcel of Owned Real Property, free and clear of all liens and encumbrances, other than Permitted Encumbrances.

"Debtor in Possession Loan Agreement" means that Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of October 13, 2009, by and among the Seller and General Electric Capital Corporation, as Lender (as defined in the Debtor in Possession Loan Agreement) and Agent (as defined in the Debtor in Possession Loan Agreement"), among others.

"Deposit Escrow Agreement" means the Deposit Escrow Agreement to be entered into among the Seller, Purchaser and Escrow Agent, attached hereto as Exhibit B.

"Determined Cure Costs" means, in the aggregate, all Cure Costs that have been determined pursuant to a Final Order or pursuant to an agreement among, the Purchaser, the Seller and the counterparty to the applicable Assigned Contract.

"Disclosure Schedule" means the Disclosure Schedule attached hereto, dated as of the date hereof, and delivered by the Seller to the Purchaser in connection with this Agreement.

"Drydocks" means the PETE-B Drydock and the WW Drydock included among the Purchased Assets.

"Effective Time" means 12:00 a.m. on the Closing Date.

"Employee" means any past or present, full- or part-time employees of the Seller or its Affiliates.

"Employee Plans" means (i) all employee benefit plans (as defined in Section 3(3) of ERISA) and any bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance or other benefit plans, programs or arrangements in which any Employee participates, and all employment, termination, severance, change-in-control, incentive, compensatory or other contracts or agreements with any Employee, to which the Seller is a party (whether or not subject to ERISA, written or oral, qualified or nonqualified, funded or unfunded, currently effective or terminated), and any trust, escrow, insurance policy, or similar funding mechanism related thereto, with respect to which the Seller or the Controlled Group has any present or future obligation or which are maintained, contributed to or sponsored by the Seller for the benefit of any Employee; (ii) each employee benefit plan related solely to the Business for which the Seller or the Controlled Group could incur liability under Section 4069 of ERISA in the event such plan has been or were to be terminated; (iii) any plan related solely to the Business in respect of which the Seller could incur liability under Section 4212(c) of ERISA; and (iv) any material Contracts between the Seller or any of their Affiliates, and any Employee.

"Environmental Law" means any federal, state, local or foreign statute, Law, ordinance, regulation, rule, code, order, consent decree, judgment, requirement, or rule of Law, in each case in effect as of the date hereof, relating to pollution or protection of the environment.

"Environmental Liability" means any claim, demand, order, suit, obligation, liability, cost (including the cost of any investigation, testing, compliance or remedial action), consequential damages, loss or expense (including reasonable and incurred attorneys' and consultants' fees and expenses) arising out of, relating to or resulting from any Environmental Law or environmental, health or safety matter or condition, including Natural Resources Damages, and related in any way to the Purchased Assets or to this Agreement or its subject matter, in each case whether arising or incurred before, at or after the Closing, including any and all Liabilities and Obligations (whether arising under Environmental Laws in effect at Closing or thereafter, Environmental Permits, common law, Contracts or otherwise in any manner whatsoever, whether known or unknown on the Closing Date) arising out of, relating to or resulting from:

(i) the presence in, on, at or under, or the Release to, at or from any of the Owned Real Property, any of the Leased Real Property or any area used or affected pursuant to the Permits and Licenses, including all soil, sediments, water, groundwater, buildings, structures, fixtures, improvements and equipment thereon or thereunder and Releases therefrom into the air, of any Hazardous Material, whether before or after the Closing;

(ii) the presence of any Hazardous Material in, on, at or under any land, sediments, water, groundwater or any other location whatsoever when such Hazardous Material originated, whether before or after the Closing, from any of the Owned Real Property, any of the Leased Real Property or any area used or affected pursuant to the Permits and Licenses,

ATLANTA:5199621.1

including all soil, sediments, water, groundwater, buildings, structures, fixtures, improvements and equipment thereon or thereunder; and

(iii)   any other circumstance, condition, matter, occurrence, issue, event or requirement relating to the environment (which includes any building, structure, fixture, improvement or equipment on or forming part of any of the Purchased Assets), health or safety that exists in, on, at or under any of the Owned Real Property, any of the Leased Real Property or any area used or affected pursuant to the Permits and Licenses, including all soil, sediments, water, groundwater, buildings, structures, fixtures, improvements and equipment thereon or thereunder that is or was caused (directly or indirectly) by, or arises from or relates to, the operation of the Business or the Purchased Assets, whether before or after the Closing.

"Environmental Permits" means any permit, approval, identification number, license and other authorization required under or issued pursuant to any applicable Environmental Law or otherwise required by any applicable Governmental Authority.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the formal guidance thereunder.

"Escrow Agent" has the meaning given to it in the Deposit Escrow Agreement and does not include the escrow officer for the Title Company.

"Excluded Assets" has the meaning given to it in Section 2.01(b).

"Excluded Contract" has the meaning given to it in Section 5.06(a).

"Excluded Liabilities" has the meaning given to it in Section 2.02(b).

"Excluded Taxes" means all Taxes relating to the Purchased Assets or the Business for any Pre-Closing Period.

"Facilities Use Agreement" means the Facilities Use Agreement entered into by the Purchaser and the Seller on or following the Closing, in substantially the form of Exhibit G.

"Final Order" means an order of the Bankruptcy Court which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

"Financial Advisor" means Global Hunter Securities, LLC.

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"Governmental Authority" means any federal, national, supranational, tribal, state, provincial, local or other government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

6

ATLANTA:5199621.1

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"GulfMark" has the meaning given to it in Section 5.25.

"GulfMark Assets" has the meaning given to it in Section 5.25.

"Hazardous Material" means (a) any petroleum, petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials or polychlorinated biphenyls or (b) any other chemical, material or substance now or hereafter defined, listed, designated or classified as, or otherwise determined to be regulated as toxic or hazardous or as a pollutant, contaminant or as solid or hazardous waste under any Environmental Law, including, without limitation, asbestos.

"Insurance Policies" has the meaning given to it in Section 3.16.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and Internet domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (b) confidential and proprietary information, including trade secrets and know-how, and (c) registrations and applications for registration of the foregoing, in each case related to the Purchased Assets or the ship repair portion of the Business.

"IRS" means the Internal Revenue Service of the United States.

"Law" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Leased Real Property" means the real property listed on Section 2.01(a)(i)(B) of the Disclosure Schedule and as marked on the diagram set forth in Section 2.01(a)(i)(C) of the Disclosure Schedule, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems and items of personal property of such Seller used primarily in the Business attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing. Leased Real Property shall also include any and all water rights and water access rights, land access rights, rail access and use rights, and all other real property use granted by virtue of license, use easement or access agreements. In the event the legal descriptions for the Leased Real Property as shown on the Survey and to be insured by the Title Company differ from the legal descriptions serving as the basis for the diagram set forth in Section 2.01(a)(i)(C) of the Disclosure Schedule, the Seller and the Purchaser will utilize the Survey legal descriptions for purposes of the conveyance of the leasehold interests in the Leased Real Property at Closing and the diagram of the Leased Real Property shall be accordingly revised and updated.

"Liabilities and Obligations" means any and all debts, liabilities, obligations to perform services and other obligations, whether known or unknown, asserted or unasserted, accrued or fixed, absolute or contingent, matured or unmatured, liquidated or unliquidated, or determined or determinable, whenever or however arising, including those arising under any Law, Action or

7

ATLANTA:5199621.1

Governmental Order and those arising under any contract, agreement, arrangement, commitment or undertaking, and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"Liens" means any mortgage, deed of trust, pledge, assignment, security interest, encumbrance, mechanics liens, labor and materialman liens, supplier liens, any other liens, charge, hypothecation, or claim of any kind or nature whatsoever in respect of any property, other than any license of Intellectual Property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Law.

"Loss" has the meaning given to it in Section 5.09(a).

"Material Adverse Effect" means any circumstance, change in or effect on the Purchased Assets that is materially adverse to the proposed operation of a ship building and repair facility by the Purchaser immediately following the Closing; provided, however, that none of the following, either alone or in combination, shall be considered in determining whether there has been a "Material Adverse Effect": (a) events, circumstances, changes or effects that generally, or in the regions in which the Business operates, affect the industries in which the Business operates (including legal and regulatory changes) unless the event or change is specific to or directed at the Seller or otherwise disproportionately affects the Seller relative to other businesses in the Seller's industry; (b) general economic or political conditions or events, circumstances, changes or effects affecting the financial or securities markets generally unless such events, circumstances, changes or effects disproportionately affect the Seller relative to other businesses in the Seller's industry; (c) events, circumstances, changes or effects relating to foreign currency exchange rate fluctuations; (d) changes arising from the consummation of the Transactions, or the announcement of the execution of this Agreement, including (i) any actions of competitors, (ii) any actions taken by or losses of Employees or (iii) any delays or cancellations of orders for products or services; (e) any circumstance, change or effect that results from any action required to be taken pursuant to or in accordance with this Agreement or at the request of the Purchaser; and (f) any action taken by the Seller or any of its Affiliates within the Chapter 11 Case in respect of the assets and business not included in the Business, and any event, circumstance, change or effect arising by reason only of the mere filing of the Chapter 11 Case.

"Material Contracts" has the meaning given to it in Section 3.14(a).

"Missing Property Reduction" has the meaning given to it in Section 2.06.

"Natural Resources Damage" means the injury to, destruction of, or loss of natural resources resulting from a Hazardous Material release or violation of Environmental Laws. The measure of damage is the cost of restoring injured natural resources to their pre-Hazardous Material release baseline condition, compensation for the interim loss of injured natural resources pending recovery, and the reasonable cost of a damage assessment. Natural resources include land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other

8

ATLANTA:5199621.1

such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by any Governmental Authority.

"<u>Original Agreement</u>" has the meaning given to it in the Recitals.

"<u>Overbid Deposit Amount</u>" has the meaning given to it in <u>Section 2.07</u>.

"<u>Owned Real Property</u>" means the real property listed on <u>Section 2.01(a)(i)(A)</u> of the Disclosure Schedule and as marked on the diagram set forth in <u>Section 2.01(a)(i)(C)</u> of the Disclosure Schedule, and which, for clarity, includes all mineral and water rights, buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, and items of personal property of the Seller attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing, including, without limitation, any and all water rights and water access rights, land access rights, and rail access and use rights.  In the event the legal descriptions for the Owned Real Property as shown on the Survey and to be insured by the Title Company differ from the legal descriptions serving as the basis for the diagram set forth in <u>Section 2.01(a)(i)(C)</u> of the Disclosure Schedule, Seller and Purchaser will utilize the Survey legal descriptions for purposes of the conveyance of the Owned Real Property at Closing and the diagram of the Owned Real Property shall be accordingly revised and updated.

"<u>Owned Real Property Transfer Documents</u>" has the meaning given to it in <u>Section 2.13</u>.

"<u>Permits and Licenses</u>" has the meaning given to it in <u>Section 2.01(a)(iv)</u>.

"<u>Permitted Encumbrances</u>" means only those liens and encumbrances which appear on the preliminary title reports to be issued by the Title Company for each parcel of Owned Real Property and each parcel of Leased Real Property which are deemed to be acceptable liens or encumbrances by the Purchaser, in the Purchaser's sole discretion, and which the Purchaser will agree are either Permitted Encumbrances or unpermitted exceptions by written notice to the Seller within thirty (30) days of Purchaser's receipt of the preliminary title reports.   All unpermitted exceptions must be removed by Seller, and any new exception to title which arises after the date of the preliminary title reports shall be deemed an unpermitted exception unless otherwise expressly approved, in writing, as a Permitted Encumbrance by the Purchaser.

"<u>Permitting Process</u>" has the meaning given to it in <u>Section 5.12</u>.

"<u>Person</u>" means any individual, partnership, firm, corporation, limited liability company, association, trust, Governmental Authority, first nation, aboriginal or native group or band, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"<u>Personal Information</u>" means any personal information protected by any applicable Laws governing privacy matters and the protection of personal information.

"<u>Plot A Lease</u>" has the meaning given to it in <u>Section 5.29</u>.

9

ATLANTA:5199621.1

"Post-Closing Assigned Contracts" has the meaning given to it in Section 5.27(b)(iii).

"Post-Closing Period" means any period (or portion thereof) beginning after the Closing Date.

"Pre-Closing Period" means any period (or portion thereof) ending on or prior to the Closing Date.

"Property Taxes" means real and personal *ad valorem* property Taxes and any other Taxes imposed on a periodic basis and measured by the value of any item of property.

"Prorated Tax Payment" means the prorated amount to be paid by the Seller, as determined in accordance with Section 5.18, of any Tax, obligation, assessment, charge, refund, reimbursement, rent installment, fee or revenue that has accrued or come due, but not been paid by the Seller, prior to the Closing Date.

"Purchase Price" has the meaning given to it in Section 2.03.

"Purchase Price Bank Account" means a bank account in the United States to be designated by the Seller in a written notice to the Purchaser at least five (5) Business Days before the Closing.

"Purchased Assets" has the meaning given to it in Section 2.01(a).

"Purchased Tools and Equipment" has the meaning given to it in Section 2.06.

"Purchaser" has the meaning given to it in the Preamble.

"Purchaser's Bid" has the meaning given to it in the Bidding Procedures.

"Purchaser's Additional Deposit" has the meaning given to it in Section 2.07.

"Purchaser's Deposit" has the meaning given to it in Section 2.07.

"Purchaser's Initial Deposit" has the meaning given to it in Section 2.07.

"Purchaser's Real Estate Closing Costs" means the Purchaser's portion of all real estate closing costs to be paid to the Title Company.

"Qualified Overbid" means a Bid that conforms to the requirements of a Qualified Overbid in Exhibit D.

"Real Property Leases" means the leases of the Leased Real Property.

"Regulations" means the Treasury regulations (including temporary regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

10

ATLANTA:5199621.1

"Release" has the meaning prescribed in any applicable Environmental Law, and includes any release, spill, leak, pumping, pouring, emission, emptying, discharge, injection, escape, leaching, disposal, dumping, deposit, spraying, burial, abandonment, incineration, seepage and placement.

"Representatives" means, with respect to a particular Person, any director or officer or other designated representative of such Person, including such Person's attorneys and financial advisors.

"Retained Names and Marks" has the meaning given to it in Section 5.13.

"Sale Motion" has the meaning given to it in Section 5.01.

"Sale Procedures Motion" has the meaning given to it in Section 5.01.

"Seller" has the meaning given to it in the Preamble.

"Seller's Knowledge" and "Knowledge of the Seller" mean the actual knowledge of the Thomas Bender, Frank Terrell, Robert Beckman and Joseph W. Mangin and the knowledge such individuals should have obtained upon reasonable inquiry in the performance of their duties on behalf of the Seller.

"Seller's Real Estate Closing Costs" means the Seller's portion of all real estate closing costs to be paid to the Title Company.

"Survey" means those surveys to be obtained by the Purchaser from Rowe Surveying & Engineering Co., Inc. (or such other vendor as is engaged by the Purchaser) in connection with the Purchaser obtaining the title insurance described in Section 7.02(i).

"Tax" or "Taxes" means any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Tax Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"Transferred Employees" has the meaning given to it in Section 6.01.

"Tax Code" means the United States Internal Revenue Code of 1986, as amended, and the formal guidance issued thereunder.

"Tax Documents" has the meaning given to it in Section 5.16.

11

ATLANTA:5199621.1

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement (including any schedule or attachment thereto, and including any amendment thereof) required to be filed with a Governmental Authority with respect to Taxes.

"Termination Date" means February 15, 2010.

"Threshold Amount" has the meaning given to it in Section 2.06.

"Title Company" has the meaning given to it in Section 2.13.

"Tool Inventories" means all tool and equipment inventories, spare parts and components, non-capitalized equipment and other materials and supplies primarily related to the Purchased Assets and maintained, held or stored by or for the Seller in connection with the Business, as of the Closing Date, and any prepaid deposits for any of the same.

"Transaction Approval Order" has the meaning given to it in Section 5.01.

"Transactions" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"Vessel Designs" means the vessel designs set forth in Section 2.01(a)(viii) of the Disclosure Schedule.

"Vessel License Arrangement" has the meaning given to it in Section 5.27(b)(i).

"WARN Act" means Worker Adjustment and Retraining Notification Act of 1988, or any state law analogous thereto.

"Welfare Benefits" means claims of Employees and their eligible beneficiaries and dependents for medical, dental, prescription drug, life insurance, and other welfare benefits.

"Winship Software" has the meaning given to it in Section 5.27.

"Yard 4 Lease" has the meaning given to it in Section 5.29.

"Yard 12 Lease" has the meaning given to it in Section 5.29.

SECTION 1.02    Interpretation and Rules of Construction.  In this Agreement, except to the extent otherwise provided or that the context otherwise requires: (a) when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated; (b) the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement; (c) whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation"; (d) the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant

12

hereto, unless otherwise defined therein; (f) the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; (g) references to a Person are also to the Person's heirs, executors, administrators, personal representatives, successors and permitted assigns, as applicable; and (h) the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

ARTICLE II

PURCHASE AND SALE

SECTION 2.01   Purchase and Sale of Assets.

(a)   Pursuant to the Transaction Approval Order and upon the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered, to the Purchaser, and the Purchaser shall purchase from the Seller, the following assets (the "Purchased Assets"), free and clear of Excluded Liabilities, other than Permitted Encumbrances:

(i)   the Owned Real Property and all of the Seller's right, title and interest in and to the Leased Real Property (and in and to security and rental deposits, whether in the form of cash or otherwise, in connection therewith);

(ii)   the equipment, Tool Inventories, Drydocks, furnishings, fixtures, machinery, vehicles, and other tangible personal property listed in Section 2.01(a)(ii) of the Disclosure Schedule;

(iii)   all of the Seller's right, title and interest in and to the Assigned Contracts and the Assigned Permits and Licenses;

(iv)   to the extent transferable and only to the extent related to the Purchased Assets, all of the Seller's right, title and interest in and to the municipal, state, federal or other regulatory franchises, permits, licenses, approvals, consents, registrations (including any registration of the Drydocks), agreements, waivers and authorizations, including but not limited to Environmental Permits, held or used by the Seller in connection with the Business, including those items listed in Section 3.09 of the Disclosure Schedule (collectively, the "Permits and Licenses"), save and except any that is an Excluded Contract;

(v)   environmental studies or reports of any nature, maintenance records for buildings, equipment, the Drydocks, and improvements on the Owned Real Property and the Leased Real Property, all bid records and bid protocols used in the Business, customer, vendor and supplier lists, drawings, diagrams or blueprints of the Purchased Assets, trade secrets related to the Purchased Assets and the ship repair portion of the Business, and other documents, records and files and any rights thereto owned, associated with or employed by the Seller in connection with the Purchased Assets, wherever located;

(vi)   (A) to the extent transferable and only to the extent related to the Purchased Assets, the full benefit of all representations, warranties, guaranties, indemnities,

13

ATLANTA:5199621.1

undertakings, certificates, covenants, agreements and all security therefor received by the Seller pursuant to the purchase or other acquisition of the Purchased Assets, and (B) any rights, demands, claims, credits, allowances, rebates, causes of action, known or unknown, or rights of setoff, other than against the Seller or any of its Affiliates, arising out of or relating to any of the Purchased Assets;

(vii)    to the extent transferable, all water rights and water access Permits and Licenses required to operate a ship repair facility; and

(viii)    certain (A) Intellectual Property as listed in Section 2.01(a)(viii) of the Disclosure Schedule, (B) licenses to use the Winship Software, as further described in Section 5.27 and (C) licenses to use the Vessel Designs (but only to the extent that each such license is not subject to an executory Contract which would restrict the grant of a license free and clear of all Liabilities and Obligations (including royalties due to any party)), as further described in Section 5.27.

(b)    Notwithstanding anything in Section 2.01(a) to the contrary, the Seller shall not sell, convey, assign, transfer or deliver, nor cause to be sold, conveyed, assigned, transferred or delivered, to the Purchaser, and the Purchaser shall not purchase, and the Purchased Assets shall not include, the Seller's right, title and interest in and to any assets of the Seller not expressly included in the Purchased Assets (the "Excluded Assets"):

(i)    any rights to Tax refunds, credits or similar benefits attributable to Excluded Taxes;

(ii)    the company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of the Seller, as well as any other records or materials relating to the Seller generally, and not involving or related to the Purchased Assets or the operations of the Business;

(iii)    the Retained Names and Marks;

(iv)    all rights of the Seller under this Agreement and the Ancillary Agreements to which the Seller is a party;

(v)    Tax Returns of the Seller, other than those relating solely to the Purchased Assets, except that income tax returns and documents and records related to such income tax returns (whether or not relating solely to the Purchased Assets) shall be Excluded Assets; and

(vi)    any Excluded Contract and rights thereunder, and any Material Contract which the Bankruptcy Court has determined shall not be assigned to the Purchaser;

(vii)    any rights, demands, claims, and actions, including, without limitation, causes of action constituting avoidance actions or other claims of the Seller's estate under chapter 5 of the Bankruptcy Code (such estate, the "Bankruptcy Estate"); and

(viii)    any right, Contract, assets, personal property of any nature or kind, real property or claims not described as a Purchased Asset.

14

ATLANTA:5199621.1

SECTION 2.02    Assumption and Exclusion of Liabilities and Obligations.

(a)    The Purchaser shall assume no Liabilities and Obligations of the Seller except the Liabilities and Obligations specifically set forth in this Section 2.02(a), subject in all cases to the exclusions set forth in Section 2.02(b) (the "Assumed Liabilities"), which the Purchaser shall assume and pay, perform and discharge in accordance with their respective terms, subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such Liabilities and Obligations are owed:

(i)    all Liabilities and Obligations of the Seller arising under the Real Property Leases (other than any that is an Excluded Contract) and the Permits and Licenses (other than any that is an Excluded Contract), in each case occurring only after the Effective Time, except for Liabilities and Obligations, actual or contingent, arising out of the Seller's default under, or breach of, any such Real Property Leases or Permits and Licenses prior to the Closing Date; provided, however, that the manner of payment of the Cure Costs associated with such Real Property Leases and Permits and Licenses shall be as described in Section 2.09 and Section 5.06(c);

(ii)    all Liabilities and Obligations of the Seller under the Permitted Encumbrances occurring only after the Effective Time;

(iii)    all Property Taxes and assessments on the Purchased Assets that relate to the Post-Closing Period; and

(iv)    all other Liabilities and Obligations arising after the Effective Time solely in connection with the ownership, operation, and use of the Purchased Assets after the Effective Time that are not subject to any pre-existing condition that occurred prior to the Effective Time; provided, however, the Purchaser shall not assume any liabilities or obligations arising out of the Seller's, or its customers', use of the Purchased Assets after the Closing.

(b)    For purposes of this Section 2.02(b), the term "Seller" shall include the Seller and any predecessor or Affiliate of the Seller.  Notwithstanding anything to the contrary in this Agreement, the parties expressly acknowledge and agree that the Purchaser shall not assume or in any manner whatsoever be liable or responsible for any liability or obligation of the Seller (other than the Assumed Liabilities and Cure Costs), including, but not limited to:

(i)    any Environmental Liabilities;

(ii)    all of the Seller's Liabilities and Obligations in connection with any assets of the Seller other than the Purchased Assets;

(iii)    all of the Seller's Liabilities and Obligations arising out of or resulting from the Seller's ownership, operation, use or lease of the Purchased Assets before the Closing, including but not limited to all Liabilities and Obligations of the Seller arising under the Real Property Leases and Permits and Licenses;

(iv)    all of the Seller's Liabilities and Obligations arising out of or resulting from any proceeding, including any and all known or unknown claims of the Seller's Employees

15

ATLANTA:5199621.1

or third parties of any nature, including, but not limited to, claims in respect of exposure to Hazardous Material, including without limitation exposure to asbestos, or other Environmental Liabilities,

(v)     all of the Seller's Liabilities and Obligations arising out of or resulting from any failure by the Seller to comply with any applicable Law, judgment or Governmental Order;

(vi)     all of the Seller's Liabilities and Obligations to any current or former shareholder, director, or officer of the Seller or any Affiliate of the Seller;

(vii)    all Liabilities and Obligations in respect of Excluded Taxes;

(viii)   all of the Seller's Liabilities and Obligations to any Employee of the Seller arising out of or resulting from the Employee's service as an Employee of the Seller, including, but not limited to, personal injury claims, or any ERISA or other Welfare Benefits claims;

(ix)     all claims or Liens that have been or may be asserted relating to any matter that preceded the Closing Date;

(x)      all Actions pending or threatened against the Seller, the Business or the Purchased Assets prior to the Closing Date;

(xi)     all Liabilities and Obligations of the Seller incurred during or arising from the Chapter 11 Case that are not specifically assumed under this Agreement;

(xii)    all Liabilities and Obligations of the Seller related to any Vessel Design, except to the extent such Vessel Design is subject to a Vessel License Arrangement that is an Assigned Contract hereunder; and

(xiii)   all Liabilities or Obligations for continued health care coverage for any "M&A Qualified Beneficiary" (as defined in Treasury Regulation Section 54.4980 B-9, Q&A 4(a) under Code Section 4980B) or under any equivalent foreign laws.

The Liabilities and Obligations referenced in this Section 2.02(b) are referred to herein as the "Excluded Liabilities".  For the avoidance of doubt, all Liabilities and Obligations related to or arising from the matters described in the Disclosure Schedules called for by Article III of this Agreement shall be Excluded Liabilities, except to the extent otherwise specifically provided in Section 2.02(a)(i)-(iv).

SECTION 2.03    Purchase Price.  The purchase price (the "Purchase Price") payable by the Purchaser to the Seller for the sale, transfer, assignment, conveyance and delivery to the Purchaser of the Purchased Assets shall be equal to the sum of: (a) $21,000,000; minus (b) the Cure Costs; minus (c) the Missing Property Reduction, if any, determined pursuant to Section 2.06.

SECTION 2.04    Payment of the Purchase Price.  The Purchaser shall pay the Purchase Price to the Seller as follows:

16

ATLANTA:5199621.1

(a)　the sum of: (i) $21,000,000; minus (i) the amount of the Purchaser's Deposit plus all accrued interest thereon; minus (ii) the amount of the Determined Cure Costs as of two (2) Business Days prior to the Closing Date; minus (iii) the amount of the Asserted Cure Costs plus the amount of the Escrow Agent's fees under the Asserted Cure Costs Escrow Agreement; minus (iv) the amount of the Missing Property Reduction, if any; minus (v) the amount of the Seller's Real Estate Closing Costs; minus (vi) Conveyance Taxes; minus (vii) the amount of the Prorated Tax Payment, shall be paid by completed wire transfer to the Purchase Price Bank Account of immediately available funds on the Closing Date;

(b)　the amount of the Purchaser's Deposit plus all accrued interest thereon shall be deemed to be paid by the Purchaser by the release of such amount on the Closing Date to or for the account of the Seller by the Escrow Agent, pursuant to the Deposit Escrow Agreement and in accordance with Section 2.07.

(c)　the amount of the Asserted Cure Costs plus the amount of the Escrow Agent's fees under the Asserted Cure Costs Escrow Agreement shall be deposited with the Escrow Agent on the Closing Date pursuant to the Asserted Cure Costs Escrow Agreement, in accordance with Section 2.09(a); and

(d)　the amount of the Seller's Real Estate Closing Costs shall be paid to the Title Company on behalf of the Seller in order to the facilitate the Closing actions described in Section 2.13.

SECTION 2.05　Allocation of the Purchase Price.  The Purchaser and the Seller shall each make its own good faith allocation of the Purchase Price among the Purchased Assets and shall file its income Tax Returns and reports relating to the Purchased Assets in a manner consistent with such good faith allocation.

SECTION 2.06　Missing Property Reduction.  The parties acknowledge and agree that the amount of the Purchase Price set forth herein is based upon the assumption that the Purchaser will be able to acquire all of the tools and equipment set forth on Attachments 1 and 2 to Section 2.01(a)(ii) of the Disclosure Schedule (the "Purchased Tools and Equipment").  Prior to the Closing Date, the Purchaser and the Seller shall jointly conduct a physical inspection and count of the Purchased Tools and Equipment.  In the event the parties determine in good faith that any Purchased Tools and Equipment are missing, the Purchase Price shall be reduced pursuant to the terms of this Section 2.06, in order to account for such missing items (the "Missing Property Reduction").  The Seller and the Purchaser will use commercially reasonable efforts to agree in good faith upon any Missing Property Reduction pursuant to this Section at least twenty-four (24) hours prior to the Closing.  With respect to Purchased Tools and Equipment identified as "Category B" items in Attachment 1 to Section 2.01(a)(ii) of the Disclosure Schedule, for a Missing Property Reduction to apply, the orderly liquidation value of such missing Purchased Tools and Equipment, as such values are listed on Attachments 1 and 2 to Section 2.01(a)(ii) of the Disclosure Schedule, (i) shall be greater than $100,000 in the aggregate (the "Threshold Amount"), and (ii) the Purchase Price shall be reduced only by the amount that the orderly liquidation value of the missing Purchased Tools and Equipment exceeds the Threshold Amount.  If any equipment among the Purchased Tools and Equipment identified as a "Category A" item in Attachment 1 of Section 2.01(a)(ii) of the Disclosure Schedule is

ATLANTA:5199621.1
Case 09-12616　Doc 667-1　Filed 12/30/09　Entered 12/30/09 16:33:18　Desc
Exhibit B　Page 23 of 62

determined to be missing, then the Seller shall replace the missing item with the same type of item (in comparable or better condition and repair as compared to the missing item) and furnish such replacement to the Purchaser simultaneously with the Closing.

SECTION 2.07    Purchaser's Deposit.

(a)    Within three (3) Business Days of execution of this Agreement, the Purchaser shall pay to the Seller a good faith deposit in the amount of $300,000 (the "Purchaser's Initial Deposit") by wire transfer of immediately available funds.  The Purchaser's Initial Deposit shall be held in escrow by the Escrow Agent in accordance with the terms of the Deposit Escrow Agreement.  In the event that one or more Qualified Bidders (as defined in the Bidding Procedures) submits a Qualified Overbid, including by making the deposit required for a Qualified Overbid pursuant to the Bidding Procedures (the "Overbid Deposit Amount"), then not later than the date of the Auction (as defined in the Bidding Procedures), the Purchaser shall be required to make an additional good faith deposit (the "Purchaser's Additional Deposit") by wire transfer of immediately available funds in the amount of $950,000, which represents the difference between the Overbid Deposit Amount and the Purchaser's Initial Deposit; provided, however, that if the actual Overbid Deposit Amount established by the Bidding Procedures is less than $1,250,000, then the Purchaser's Additional Deposit shall be reduced to an amount equal to (A) the Overbid Deposit Amount minus (B) $300,000.  (The aggregate of the Purchaser's Initial Deposit and, if applicable, the Purchaser's Additional Deposit (but only to the extent the Purchaser's Additional Deposit is made) is referred to herein as the "Purchaser's Deposit").  The Escrow Agent shall be entitled to withdraw the Escrow Agent's escrow fees and charges in connection with the Deposit Escrow Agreement from the Purchaser's Deposit pursuant to the terms of Deposit Escrow Agreement.

(b)    Without limiting the rights of the parties hereunder, and subject to terms of the Deposit Escrow Agreement: (i) if this Agreement is terminated by the Seller or the Purchaser for any reason other than in accordance with Section 8.01(c), then the Purchaser's Deposit, plus any accrued interest thereon, shall be returned to the Purchaser within three (3) Business Days of such termination; provided, further, that the Seller and the Purchaser agree, for clarity's sake, that failure to satisfy any of the Purchaser's conditions to closing contained in Section 7.02 shall result in the Purchaser's Deposit plus any accrued interest thereon being returned to the Purchaser; (ii) if this Agreement is terminated by the Seller in accordance with Section 8.01(c), then the Seller shall be entitled to retain the Purchaser's Deposit, plus any accrued interest thereon.  Each party shall cooperate with the other in connection with the return or release of the Purchaser's Deposit in accordance with the provisions hereof and the Deposit Escrow Agreement, including by providing such instructions as are required to be delivered to the Escrow Agent to facilitate the timely return or release of the Purchaser's Deposit.

(c)    At the Closing, the Purchaser shall cause the Escrow Agent to transfer to the Purchase Price Bank Account the Purchaser's Deposit, plus any accrued interest thereon.

SECTION 2.08    Reserved.

ATLANTA:5199621.1

SECTION 2.09    Cure Costs.

(a)    On the Closing Date, in accordance with Section 2.04(c), the Purchaser shall deliver to and deposit in trust with the Escrow Agent, pursuant to the terms of a Cure Costs Escrow Agreement to be entered into among the Seller, the Purchaser and the Escrow Agent, in substantially the form attached hereto as Exhibit C (the "Asserted Cure Costs Escrow Agreement"), an amount from the Purchase Price equal to the Asserted Cure Costs (the "Asserted Cure Costs Deposit") plus the amount of the Escrow Agent's fees under the Asserted Cure Costs Escrow Agreement.  Interest on the Asserted Cure Costs Deposit shall be deemed a part of the Asserted Cure Costs Deposit for all purposes of this Agreement.  The Asserted Cure Costs Deposit shall only be released in accordance with Section 2.09(b).  The Escrow Agent shall be entitled to withdraw the Escrow Agent's escrow fees and charges in connection with the Asserted Cure Costs Escrow Agreement from the escrow account pursuant to the terms of Asserted Cure Costs Escrow Agreement.

(b)    As and when any Asserted Cure Costs become Determined Cure Costs, (i) the amount of such Determined Cure Costs shall be released from the Asserted Cure Costs Deposit to the Purchaser by the Escrow Agent, and (ii) if any such Asserted Cure Costs are greater than the corresponding Determined Cure Costs, then the amount equal to the difference between such Asserted Cure Costs and the corresponding Determined Cure Costs shall be released from the Asserted Cure Costs Deposit to the Seller by the Escrow Agent, in each case in accordance with the terms of the Asserted Cure Costs Escrow Agreement.  After all Asserted Cure Costs have become Determined Cure Costs, the balance of the Asserted Cure Costs Deposit shall be released to the Seller in accordance with the terms of the Asserted Cure Costs Escrow Agreement.

SECTION 2.10    Closing.  Subject to the terms and conditions of this Agreement, the sale and purchase of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the "Closing") to be held at the offices of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, 601 Poydras Street, Suite 2775, New Orleans, Louisiana 70130, at 10:00 A.M. Central time no later than three (3) Business Days following the satisfaction or waiver of the conditions to the obligations of the parties hereto set forth in Section 7.01 and Section 7.02, or at such other place or at such other time or on such other date as the Seller and the Purchaser may mutually agree upon in writing (the "Closing Date").  The Purchaser shall be deemed to have purchased the Purchased Assets and assumed the Assumed Liabilities as of the Effective Time.  The closing of the real estate transfers will occur with the Title Company located in Mobile, Alabama, assisted by Anchor Title, LLC, located in Mobile, Alabama, in accordance with Section 2.13.

SECTION 2.11    Closing Deliveries by the Seller.  At the Closing, the Seller shall deliver or cause to be delivered to the Purchaser:

(a)    a certified copy of the Transaction Approval Order, as entered by the Bankruptcy Court;

(b)    the Bill of Sale; executed Deeds for the Owned Real Property to be recorded with copies of all required Conveyance Tax stamps affixed; the Assignments and

19

ATLANTA:5199621.1

Amendments of Leasehold Rights, together with memoranda or short forms thereof as may be required by Purchaser or the Title Company to be recorded, with copies of all required Conveyance Tax stamps affixed and/or lease taxes paid; necessary or desired mortgagee consents and non-disturbance agreements from any mortgagee of the owners and/or landlords of the Leased Real Property (duly executed by such mortgagees, and in recordable form where applicable); all other documents required by the Title Company to transfer the Owned Real Property and to issue title insurance for all parcels of Owned Real Property and all parcels of Leased Real Property; and such other instruments, in form and substance reasonably satisfactory to the Purchaser, as may be reasonably requested by the Purchaser to effect the transfer of the Purchased Assets to the Purchaser, or to register or evidence such transfer on the public records, in each case duly executed by the Seller;

(c)     executed counterparts of the Asserted Cure Costs Escrow Agreement;

(d)     executed counterparts of each Ancillary Agreement to which the Seller is a party, other than the Ancillary Agreements delivered pursuant to Section 2.11(b) and (c);

(e)     a receipt for the amount contemplated by Section 2.04(a);

(f)     a certificate of non-foreign status pursuant to section 1.1445-2(b)(2) of the Regulations for the Seller that is selling a United States real property interest within the meaning of section 897(c) of the Tax Code;

(g)     a certificate of a duly authorized officer of the Seller certifying as to the matters set forth in Section 7.02(a);

(h)     corporate resolutions authorizing the Seller to enter into this Agreement and the Ancillary Agreements;

(i)     marked title commitments in respect of each parcel of Owned Real Property and Leased Real Property conforming to the requirements set forth in Section 7.02(l);

(j)     completed registration transfers for the Drydocks; and

(k)     estoppel certificates in recordable form from each of the landlords/lessors of the Real Property Leases duly executed by the landlords/lessors, certifying that the Real Property Leases are unmodified and in full force and effect (and if there have been modifications, that the same is in full force and effect as modified, and stating said modifications); certifying the amount of any deposits thereunder; certifying that there are no unsatisfied construction or improvement obligations with respect thereto (or if such obligations remain, stipulating the extent of same); certifying that all rental concessions or tenant allowances thereunder have been received by Seller (or if not yet so received, stipulating the nature and extent of same); certifying that there are no defenses or offsets against the enforcement thereof, or stating all those claimed by Seller; certifying the date to which base rent and other charges have been paid; certifying that there are no defaults, or events which, with the giving of notice or the passage of time, would be an event of default under the Real Property Leases, except for defaults arising as a result of the Chapter 11 Case; and certifying as to any other matters which may reasonably be requested.

ATLANTA:5199621.1

SECTION 2.12    Closing Deliveries by the Purchaser.  At the Closing, the Purchaser shall deliver, or cause to be delivered,

(a)    to the Seller:

(i)    (A) the amount contemplated by Section 2.04(a), by wire transfer in immediately available funds; and (B) the Purchaser's Deposit, plus any accrued interest thereon, in each case, to the Purchase Price Bank Account;

(ii)    executed counterparts of the Bill of Sale, the Assignments and Amendments of Leasehold Rights, and all other documents required by the Title Company to transfer the Owned Real Property and to issue title insurance for all parcels of Owned Real Property and all parcels of Leased Real Property, and such other instruments, in form and substance satisfactory to the Seller, as may be reasonably requested by the Seller, to effect the assumption by the Purchaser of the Assumed Liabilities and to evidence such assumption and agreement to perform on the public records;

(iii)    executed counterparts of each Ancillary Agreement to which the Purchaser is a party;

(iv)    a certificate of a duly authorized officer of the Purchaser certifying as to the matters set forth in Section 7.01(a);

(v)    corporate resolutions authorizing the Purchaser to enter into this Agreement and the Ancillary Agreements; and

(b)    to the Escrow Agent, the Asserted Cure Costs Deposit.

SECTION 2.13    Closing Documents; Transfers of Real Property.   All closing documents required pursuant to Section 2.11, Section 2.12, Section 7.01, and Section 7.02 shall be executed and placed into escrow at the offices of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, 601 Poydras Street, Suite 2775, New Orleans, Louisiana 70130, at 12:00 p.m. Central time on the Business Day before the Closing Date.  Notwithstanding anything in this Section 2.13 to the contrary, all Deeds (in form and substance satisfactory to the Purchaser) and associated transfer documents (including transfer Tax forms) for the Owned Real Property (the "Owned Real Property Transfer Documents") shall be executed and placed into escrow with First Mobile Title Company (the "Title Company") for recordation with the applicable county clerks or county recorder's office, as the case may be, in the county where the Owned Real Property is located.  The Title Company shall hold in escrow all Owned Real Property Transfer Documents for recordation until instructed to release and record such documents pursuant to written notice from both the Seller and the Purchaser on the Closing Date.  Upon such notice, the Title Company shall record all applicable documents and return copies of the recorded documents to the Purchaser in accordance with the Purchaser's escrow instructions.  The Seller and the Purchaser agree that the recordation of the Owned Real Property Transfer Documents will occur immediately prior to the payment of the Purchase Price pursuant to Section 2.04.  For clarity's sake the Purchaser shall be responsible for payment of the Purchaser's Real Estate Closing Costs on the Closing Date.

21

ATLANTA:5199621.1

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Purchaser as follows:

SECTION 3.01    Organization, Authority and Qualification of the Seller; Enforceability. Except as a result of the commencement of the Chapter 11 Case, the Seller is a corporation, duly organized, validly existing and in good standing under the laws of the State of Alabama, and, subject to obtaining the approval of the Bankruptcy Court, has all necessary power and authority to enter into this Agreement and the Ancillary Agreements, to carry out its obligations hereunder and thereunder, and to consummate the Transactions.  The Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its respective business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing: (a) has resulted from the commencement or continuance of the Chapter 11 Case; or (b) would not: (i) adversely affect the ability of such Seller to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions; or (ii) otherwise have a Material Adverse Effect.  Subject to obtaining the Transaction Approval Order from the Bankruptcy Court, the execution and delivery of this Agreement and the Ancillary Agreements by the Seller, the performance by the Seller of its obligations hereunder and thereunder, and the consummation by the Seller of the Transactions have been duly authorized by all requisite action on the part of the Seller and its shareholders.  This Agreement has been, and upon their execution, the Ancillary Agreements shall have been, duly executed and delivered by the Seller, and (assuming due authorization, execution and delivery by the Purchaser), subject to the approval of the Bankruptcy Court, this Agreement constitutes, and, upon their execution, the Ancillary Agreements shall, constitute, legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

SECTION 3.02    No Conflict.  Subject to the approval of the Bankruptcy Court, and assuming that all consents, approvals, authorizations and other actions described in Section 3.03 have been obtained, all filings and notifications listed in Section 3.03 of the Disclosure Schedule have been made, and any applicable waiting period has expired or been terminated, and except as may result from any facts or circumstances relating solely to the Purchaser, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Seller do not and will not, except as set forth in Section 3.02 of the Disclosure Schedule: (a) violate, conflict with or result in the breach of the articles of incorporation or bylaws (or similar organizational documents) of the Seller; (b) conflict with or violate any Law or Governmental Order applicable to the Seller; or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, acceleration or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Seller is a party, except to the extent that any such rights of termination, acceleration or cancellation are not enforceable due to operation of the

ATLANTA:5199621.1

Bankruptcy Code, and except, in the case of clauses (b) and (c), as would otherwise be rendered unenforceable as a result of the Transaction Approval Order.

SECTION 3.03    Governmental Consents and Approvals.  The execution, delivery and performance of this Agreement and each Ancillary Agreement by the Seller do not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Authority, except:  (a) the approval of the Bankruptcy Court; (b) as described in Section 3.03 of the Disclosure Schedule; (c) as may be rendered unnecessary as a result of, or by the entry of, the Transaction Approval Order; and (d) as may be necessary as a result of any facts or circumstances relating solely to the Purchaser or any of its Affiliates.

SECTION 3.04    Litigation.  Except for the Chapter 11 Case, and any and all Actions arising therefrom or related thereto, and as set forth in Section 3.04 of the Disclosure Schedule, as of the date hereof there is no Action, and to the Knowledge of the Seller, no such Action is threatened, by or against the Seller or otherwise relating to the Purchased Assets or the Business.

SECTION 3.05    Compliance with Laws.  Except as set forth in Section 3.05 of the Disclosure Schedule and as would not:  (a) adversely affect the ability of the Seller to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions; or (b) otherwise have a Material Adverse Effect, the Seller has conducted and continues to conduct the Business in accordance with all Laws and Governmental Orders applicable to the Business, and the Seller is not in violation of any such Law or Governmental Order.

SECTION 3.06    Real Property Interests.

(a)    Section 2.01(a)(i)(A) of the Disclosure Schedule lists the street address of each parcel of real property in which the Seller has fee title interest, to the extent used in the conduct of the Business.  Except as described in Section 3.06(a) of the Disclosure Schedule: (i) the Seller has good and marketable title in fee simple to each parcel of Owned Real Property free and clear of all Liens, except Permitted Encumbrances.  Each parcel of Owned Real Property has permitted and unrestricted public access to such parcel.  Each parcel of Owned Real Property fronting or abutting the water has permitted and unrestricted access to the water and the submerged and submersible lands.

(b)    Section 2.01(a)(i)(B) of the Disclosure Schedule lists the street address of each parcel of real property leased or subleased by the Seller as tenant or subtenant, as the case may be, to the extent used in the conduct of the Business.  The Seller has good and marketable leasehold title to each parcel of the Leased Real Property.  The Seller has delivered to the Purchaser, copies of all leases, including, without limitation, the Real Property Leases, and any and all amendments or estoppels or other documents related thereto in effect on the date hereof relating to the Leased Real Property.  Except as set forth on Section 2.01(a)(i)(B) of the Disclosure Schedule, there has not been any sublease or assignment or security agreement entered into by the Seller with respect to the Real Property Leases.  Each parcel of Leased Real Property has permitted and unrestricted public access to such parcel.  Each parcel of Leased Real Property fronting or abutting the water has permitted and unrestricted access to the water and the submerged and submersible lands.

ATLANTA:5199621.1

(c)     To Seller's Knowledge, all of the Owned Real Property and Leased Real Property, all improvements thereon and all uses thereof in connection with the Business, are in material compliance with all applicable zoning, occupancy and other laws, regulations, ordinances, covenants, and restrictions, and Seller has received no written notice of violation of any of the foregoing.  The Owned Real Property and Leased Real Property have access to a publicly dedicated and accepted street or road, and there are no pending or, to Seller's Knowledge threatened, governmental proceedings that would materially impair such access.

(d)     All existing water, sewer, gas and electricity lines, storm sewers and other utility systems on or in the Owned Real Property and Leased Real Property are adequate in all material respects to serve the utility needs of the Business as presently conducted.  All of such utilities are installed and operating in all material respects to serve the utility needs of the Business as presently conducted, and all installation and connection charges for which Seller is responsible have been paid in full.

SECTION 3.07    Tangible Personal Property.    Section 2.01(a)(ii) of the Disclosure Schedule contains a true and complete list of all machinery, Tool Inventories, equipment, the Drydocks, motor vehicles, furnishings, trade fixtures, chattels, and other tangible personal property owned by the Seller and included in the Purchased Assets.  Except as set forth in Section 3.07 of the Disclosure Schedule, the Drydocks are not registered with any Governmental Authority.  The Seller has good and marketable title to all personal property listed in Section 2.01(a)(ii) of the Disclosure Schedule.  Upon consummation of the Closing, the Purchaser will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens other than Permitted Encumbrances.

SECTION 3.08    Intellectual Property.    Section 2.01(a)(viii) of the Disclosure Schedule sets forth a true and complete list of all Intellectual Property.  Except as set forth in Section 3.08 of the Disclosure Schedule, with regard to the Intellectual Property listed in Section 2.01(a)(viii) of the Disclosure Schedule (other than the Vessel Designs), (a) the Seller is the owner of the entire right, title and interest in and to each item of Intellectual Property; (b) to the Knowledge of the Seller, no Person is engaging in any activity that infringes, misappropriates or otherwise violates any Intellectual Property; and (c) there is no Action pending or, to the Knowledge of the Seller, threatened in writing, against the Seller alleging that the use of any Intellectual Property infringes, misappropriates or otherwise violates the Intellectual Property rights of any third party.

SECTION 3.09    Permits and Licenses.    Section 3.09 of the Disclosure Schedule contains a complete and accurate list of all Permits and Licenses (including, but not limited to, Environmental Permits) currently held by or issued to Seller, or held by or issued to the Seller within the last five (5) years, in respect of the Purchased Assets or the Business.

SECTION 3.10    Employee Benefits.

(a)     Section 3.10(a) of the Disclosure Schedule contains a true and complete list of each Employee Plan under which any Employee has any present or future right to benefits that is sponsored or maintained by the Seller or any member of its Controlled Group or under which the Seller has had or has any present or future liability.

24

ATLANTA:5199621.1

(b)     With respect to each Employee Plan, the Seller has provided or made available to Purchaser a current, accurate and complete copy (or, to the extent no such copy exists, an accurate description) thereof and, to the extent applicable: plan documents and any amendments thereto; any trust agreement, insurance policy, or other funding agreement; the most recent Form 5500 annual report, including all attachments, filed with the U.S. Department of Labor; the most current actuarial valuation or financial statement; the most recent determination letter from the Internal Revenue Service or opinion letter for all plans intended to be qualified under the Tax Code; all reports, letters or other communications from the relevant governmental entity regarding the Employee Plan; and any summary plan description and other written communications (or a description of any oral communications) by the Seller to Employees concerning the extent of the benefits provided under an Employee Plan.

(c)     (i) Each Employee Plan has been established and administered in accordance with its terms, and in substantial compliance with the applicable provisions of ERISA, the Tax Code and other applicable Laws, rules and regulations; (ii) each Employee Plan which is intended to be qualified within the meaning of Section 401(a) of the Tax Code is so qualified, has (unless such plan is a standardized prototype) received a favorable determination letter as to its qualification (or if the plan is a standard prototype plan, it has to the Knowledge of Seller a favorable determination letter and the Seller has properly adopted such plan), and, to the Knowledge of Seller nothing has occurred, whether by action or failure to act, that could reasonably be expected to cause the loss of such qualification; (iii) no event has occurred and no condition exists that would subject the Seller, either directly or by reason of its affiliation with any member of its Controlled Group, to any tax, fine, lien, penalty or other liability imposed by ERISA, the Tax Code or other applicable Laws, rules and regulations; (iv) for each Employee Plan with respect to which a Form 5500 has been filed, no material change has occurred with respect to the matters covered by the most recent Form 5500 since the date thereof; (v) no "reportable event" (as such term is defined in ERISA Section 4043), "prohibited transaction" (as such term is defined in ERISA Section 406 and Section 4975 of the Tax Code) or "accumulated funding deficiency" (as such term is defined in ERISA Section 302 and Section 412 of the Tax Code (whether or not waived)) has occurred with respect to any Employee Plan; (vi) no Employee Plan provides retiree welfare benefits and the Seller has no obligations to provide any retiree welfare benefits except as required under Section 4980B of the Tax Code; and (vii) neither the Seller nor any member of its Controlled Group has engaged in, or is a successor or parent corporation to an entity that has engaged in, a transaction described in ERISA Sections 4069 or 4212(c).

(d)     None of the Employee Plans is or has ever been subject to Title IV of ERISA and neither the Seller nor any member of its Controlled Group, has incurred any liability under Title IV of ERISA which remains unsatisfied (including withdrawal liability and partial withdrawal liability).  No Employee Plan is a "multiple employer plan," a "multiple employer welfare arrangement," or a "multiemployer plan" within the meaning of ERISA.

(e)     With respect to any Employee Plan, (i) no actions, suits or claims (other than routine claims for benefits in the ordinary course) are pending or threatened, (ii) no facts or circumstances exist that are reasonably likely to give rise to any such actions, suits or claims and no administrative investigation, audit or other administrative proceeding by the

25

Department of Labor, the Pension Benefit Guaranty Corporation, the Internal Revenue Service or other governmental agencies are pending, in progress or, threatened.

(f)     All contributions to each Employee Plan that were required under the terms of such Employee Plan, ERISA, the Tax Code, or other applicable law have been made by the due date thereof, including any valid extension, or in the event such contributions were not yet due, are properly reflected on the Seller's financial statements, and to the Seller's Knowledge, there is no current default or violation by the Seller or any other person in relation to obligations under any Employee Plan or any funding media or insurance policy thereunder.  None of the Purchased Assets constitutes, or was acquired via the expenditure of, "plan assets", as defined in ERISA.

SECTION 3.11   Employee Controversies.  Except as disclosed in Section 3.11 of the Disclosure Schedule, since January 1, 2003, no written notice has been received by the Seller of any material complaint filed or, to the Knowledge of the Seller, threatened by any current or former Employee, or being brought or threatened on behalf of any current or former Employee, claiming that the Seller is in breach of the terms of any contract of employment, or that the Seller has violated any applicable Law with respect to employment matters, or that any current or former Employee has a claim (including any worker's compensation claim) against the Seller for any personal injury matter or any occupational safety and health matter or other Environmental Claim.  There are no outstanding Governmental Orders against the Seller under any applicable Laws relating to occupational safety and health, or any other matters relating to employment or employees, in connection with the Business.  Any levies, assessments, and penalties made in connection with the Business against the Seller pursuant to applicable Laws relating to occupational safety and health, or any other matters relating to employment or employees, have been paid in full.  Except as disclosed in Section 3.11 of the Disclosure Schedule, the Seller is not presently in violation of any applicable Law with respect to employment matters in connection with the Business.

SECTION 3.12    Labor.

(a)     Promptly after the date hereof (and in any event within five (5) Business Days), the Seller shall provide to the Purchaser a complete and accurate list of the following information for each Employee of the Seller, including each Employee on leave of absence or layoff status: (i) name and job title; (ii) current compensation (including commissions and bonuses, if any) paid or payable, and changes since December 31, 2008; and (iii) contracts or other agreements to which such Employee and the Seller are parties, including but not limited to any employment, confidentiality, non-competition, consulting or proprietary rights agreement.

(b)     Except as set forth in Section 3.12(b) of the Disclosure Schedule, (i) none of the Employees is a party to or bound by any union contract, collective bargaining agreement, employment contract, independent contractor agreement, consultation agreement, or other similar type of contract, (ii) the Seller has not agreed to recognize any union or other collective bargaining unit or union contribution agreement, and (iii) no union or collective bargaining unit has been certified as representing the Employees and, to the Knowledge of Seller, during the past five (5) years no organizational attempt has been made by or

26

ATLANTA:5199621.1

threatened by or on behalf of any labor union or collective bargaining unit with respect to any Employees. The Seller has communicated to any unions representing Employees who are affected by the transactions contemplated by this Agreement, in a lawful and timely manner, the decision to enter into this transaction, and have engaged in good faith or otherwise lawful bargaining about the effects of this transaction.

(c)     The Seller has not incurred any liability under, and has complied in all respects with, the WARN Act, and does not reasonably expect to incur any such liability as a result of actions taken or not taken prior to or as of the Closing. The Seller has not given, and has not been required to give, any notice under WARN Act within 90 days prior to the Closing.

SECTION 3.13     Taxes.

(a)     Except as set forth in Section 3.13(a) of the Disclosure Schedule, the Seller (which for purposes of this Section 3.13 includes any Affiliates of the Seller having an ownership or other interest in the Purchased Assets) has timely filed all Tax Returns that it was required to file. All such Tax Returns were correct and complete in all respects and were prepared in substantial compliance with all applicable Laws. All Taxes owed by the Seller (whether or not shown or required to be shown on any Tax Return) have been paid. The Seller is not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where the Seller does not file Tax Returns that the Seller is or may be subject to taxation by that jurisdiction. There are no Liens on any of the assets of the Seller that arose in connection with any failure (or alleged failure) to pay any Tax.

(b)     The Seller has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

SECTION 3.14     Material Contracts.

(a)     Section 3.14(a) of the Disclosure Schedule lists the material Contracts (excluding any Contracts in respect of loans for borrowed money or other financing arrangements) of the Seller as of the date of this Agreement, but only to the extent such Contracts relate to the Purchased Assets and the Business and, except for being deemed an Excluded Asset by operation of Section 2.01(b), would be transferred to the Purchaser hereunder (such Contracts, including any additional Contracts identified by Seller after the date of this Agreement (but only to the extent the inclusion of such additional Contract is approved in writing by the Purchaser) being "Material Contracts").

(b)     Except as disclosed in Section 3.14(b) of the Disclosure Schedule and except for defaults arising by virtue of the filing of the Chapter 11 Case, each Material Contract: (i) is valid and binding on the Seller and, to the Knowledge of the Seller, the counterparties thereto, with no material defaults (or current conditions, which, with the passage of time, could become violations or defaults) and is in full force and effect; and (ii) upon

27

ATLANTA:5199621.1

consummation of the Transactions, except to the extent that any consents set forth in <u>Section 3.02</u> of the Disclosure Schedule are not obtained, shall continue in full force and effect without penalty or other adverse consequence. Except as disclosed in <u>Section 3.14(b)</u> of the Disclosure Schedule and except for defaults arising by virtue of the filing of the Chapter 11 Case, the Seller is not in breach of, or default under, any Material Contract to which it is a party.

SECTION 3.15    <u>Environmental Matters</u>.    Except as disclosed in <u>Section 3.15</u> of the Disclosure Schedule:

(a)    to the Knowledge of the Seller, the Seller, to the extent related to the Purchased Assets or the Business, is in compliance with all applicable Environmental Laws and has obtained, and is in compliance with, all Environmental Permits;

(b)    except as in compliance with all applicable Environmental Laws, to the Knowledge of the Seller, no Hazardous Material is being or, during the period of the Seller's ownership, has been used, treated, stored, generated, manufactured or otherwise handled on or at any of the Owned Real Property or the Leased Real Property or, to the Seller's Knowledge, during the period of the Seller's ownership, has otherwise come to be located in (from any source, whether inside or outside of the Owned Real Property or the Leased Real Property), on or under any of the Owned Real Property or the Leased Real Property;

(c)    to the Knowledge of the Seller, except as disclosed in the Disclosure Schedule, no Hazardous Material is being used, handled, generated or stored at or on any of Owned Real Property and the Leased Real Property except in conformity with applicable Environmental Laws or as allowed pursuant to the Environmental Permits, and in each case in quantities necessary to satisfy reasonably anticipated use;

(d)    to the Knowledge of the Seller, no Hazardous Material has been spilled, released, or discharged in a manner that would result in the contamination of any of the Owned Real Property or the Leased Real Property that has not been remediated and cleaned up in full compliance with all applicable Environmental Laws;

(e)    no outstanding Liens (other than Permitted Encumbrances) have been placed on any of the Owned Real Property or the Leased Real Property under any Environmental Law;

(f)    there are no written claims, citations, lawsuits, orders or proceedings pursuant to any Environmental Law pending or, to the Seller's Knowledge, threatened, against the Seller to the extent relating to the Owned Real Property or the Leased Real Property, any of the Seller's Employees, the Business or the Purchased Assets, including, for clarity's sake, claims, citations, lawsuits, orders or proceedings relating to Environmental Liabilities, persons or other property located near or adjacent to the Owned Real Property or the Leased Real Property, the Business or the Purchased Assets;

(g)    the Seller has provided the Purchaser with access to any and all environmental site assessments, environmental audits, surveys, reports, citations, notifications, written environmental claims and written communications or notices to or from any Governmental

28

ATLANTA:5199621.1

Authority in respect of environmental issues, or reports or other similar studies or analyses and in the Seller's possession that relate to the Purchased Assets or the Business, and the Seller has permitted the Purchaser to review and copy all such documents; and

(h)     to the Knowledge of the Seller, there are no underground storage tanks on any of the Owned Real Property or the Leased Real Property, including tanks that have been closed in place or are exempt from regulation, and there are no above-ground or mobile storage tanks located on any of the Owned Real Property or the Leased Real Property.

SECTION 3.16     Insurance Policies.  Section 3.16 of the Disclosure Schedule lists (a) all current insurance policies owned or held by the Sellers or otherwise applicable to the Business, and (b) all former insurance policies owned or held by the Sellers or otherwise applicable to the Business pursuant to which claims may still be made against a carrier by the Seller (collectively, the "Insurance Policies").  Copies of all Insurance Policies have been delivered to the Purchaser by the Seller prior to the date of this Agreement.  All such current insurance policies (or substitute policies with substantially similar terms that are underwritten by insurance carriers with substantially similar or higher ratings) are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid, and, except as set forth on Section 3.16 of the Disclosure Schedule, no written notice of cancellation or termination (or any other threatened termination) has been received with respect to any such current policy.  Except as set forth on Section 3.16 of the Disclosure Schedule, there are no pending or, to the Knowledge of the Seller, threatened claims under any Insurance Policy.  In addition, Section 3.16 of the Disclosure Schedule sets forth the amount of any self-insurance reserve deposit and the location of any such deposits.

SECTION 3.17     Sufficiency of Rights.  To Seller's Knowledge, the Owned Real Property, the Leased Real Property, the Permits and Licenses, and the Material Contracts constitute all of the property rights, utility access rights, right of way, water way rights, permits, licenses and other property rights necessary or appropriate for the Purchaser to conduct a ship repair business immediately following the Closing.

SECTION 3.18     Brokers.  Except for the Financial Advisor, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Seller.  The Seller is solely responsible for the fees and expenses of the Financial Advisor.

SECTION 3.19     Full Disclosure.  This Agreement (including the Disclosure Schedule) does not, and the officer's certificate referred to in Section 2.11(g) will not, (a) contain any representation, warranty or information that is false or misleading with respect to any material fact (in the light of the circumstances under which such representations, warranties and information were or will be made or provided), or (b) omit to state any material fact necessary in order to make the representations, warranties and information contained and to be contained herein and therein (in the light of the circumstances under which such representations, warranties and information were or will be made or provided) not false or misleading.

SECTION 3.20     Disclaimer of the Seller.  THE PURCHASED ASSETS ARE BEING SOLD ON AN "AS IS", "WHERE IS" BASIS AS OF THE CLOSING AND IN ITS

ATLANTA:5199621.1

CONDITION AS OF CLOSING WITH "ALL FAULTS" AND, EXCEPT AS SET FORTH IN THIS ARTICLE III AND EXCEPT FOR ANY WARRANTIES OF TITLE CONTAINED IN ANY DEED TO ANY OWNED REAL PROPERTY DELIVERED AT THE CLOSING, NONE OF THE SELLER, ITS AFFILIATES OR ANY OF ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR OTHER REPRESENTATIVES MAKE OR HAVE MADE ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE BUSINESS OR ANY OF THE PURCHASED ASSETS, INCLUDING WITH RESPECT TO (I) THE SEAWORTHINESS OF THE MARINE EQUIPMENT CONSTITUTING A PORTION OF THE PURCHASED ASSETS; (II) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, (III) THE OPERATION OF THE BUSINESS BY THE PURCHASER AFTER THE CLOSING IN ANY MANNER OTHER THAN AS USED AND OPERATED BY THE SELLER OR (IV) THE PROBABLE SUCCESS OR PROFITABILITY OF THE BUSINESS AFTER THE CLOSING.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as follows:

SECTION 4.01    Organization and Authority of the Purchaser; Enforceability.    The Purchaser is a corporation duly formed and validly existing under the laws of the State of Delaware and has all necessary corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the Transactions.  The Purchaser is duly licensed or qualified to do business and is in good standing in each jurisdiction which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not adversely affect the ability of Purchaser to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions.  The execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party, the performance by the Purchaser of its obligations hereunder and thereunder, and the consummation by the Purchaser of the Transactions have been duly authorized by all requisite corporate action on the part of the Purchaser.  This Agreement has been, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall have been, duly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by the Seller) this Agreement constitutes, and upon their execution the Ancillary Agreements to which the Purchaser is a party shall constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

SECTION 4.02    No Conflict.    Assuming the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in Section 4.03, the execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party do not and will not: (a) violate, conflict with or result in the breach of any provision of the articles of formation or operating agreement (or similar

30

ATLANTA:5199621.1

organizational documents) of the Purchaser; (b) conflict with or violate any Law or Governmental Order applicable to the Purchaser or its respective assets, properties or businesses; or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Purchaser is a party, except, in the case of clauses (b) and (c), as would not materially and adversely affect the ability of the Purchaser to carry out its obligations under this Agreement and the Ancillary Agreements, and to consummate the Transactions.

SECTION 4.03 <u>Governmental Consents and Approvals</u>. The execution, delivery and performance by the Purchaser of this Agreement and each Ancillary Agreement to which the Purchaser is a party do not and will not require any consent, approval, authorization or other order of, action by, filing with, or notification to, any Governmental Authority, except: (a) any compliance with, filings under or approval required under, the Laws of any relevant jurisdiction; or (b) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by the Purchaser of the Transactions.

SECTION 4.04 <u>Litigation</u>. As of the date hereof, no Action by or against the Purchaser is pending or, to the knowledge of the Purchaser, threatened, which could affect the legality, validity or enforceability of this Agreement, any Ancillary Agreement or the consummation of the Transactions.

SECTION 4.05 <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Purchaser.

SECTION 4.06 <u>Independent Investigation</u>. The Purchaser is conducting its own independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition, software, technology and prospects of the Business, which investigation, review and analysis is being performed by the Purchaser and its Affiliates and representatives; <u>provided</u>, <u>however</u>, that the Purchaser has relied on the Seller to disclose and provide copies of all Material Contracts with respect to the Purchased Assets in connection with the Purchaser's investigation, review and analysis. The Purchaser hereby agrees and acknowledges that other than the representations and warranties made in <u>Article III</u> and in the Schedules and Exhibits to this Agreement, none of the Seller, its Affiliates, or any of its respective officers, directors, employees or representatives make or have made any representation or warranty, express or implied, at law or in equity, with respect to the Purchased Assets or the Business.

SECTION 4.07 <u>Financial Capabilities</u>. The Purchaser has the financial capabilities to consummate the transactions contemplated by this Agreement.

ATLANTA:5199621.1

# ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01   <u>Bankruptcy Court Approvals</u>.  Promptly following the execution by the parties of this Agreement (and in no event later than five (5) Business Days thereafter), the Seller shall file (or shall have filed) a motion with the Bankruptcy Court (the "<u>Sale Procedures Motion</u>") seeking entry of an order of the Bankruptcy Court that will, among other things, approve certain procedures with respect to the transactions contemplated by this Agreement (the "<u>Bidding Procedures Order</u>").  The Bidding Procedures Order shall be substantially in the form of <u>Exhibit D</u> attached hereto (with such changes thereto as the Seller and the Purchaser shall mutually approve).  Contemporaneously with the filing of the Sale Procedures Motion, Seller shall file a motion with the Bankruptcy Court (the "<u>Sale Motion</u>") requesting entry of an order of the Bankruptcy Court that will, among other things, approve the sale of the Purchased Assets and the assignment and assumption of the Assumed Liabilities pursuant to this Agreement (the "<u>Transaction Approval Order</u>").  The Transaction Approval Order shall be substantially in the form of <u>Exhibit E</u> attached hereto (with such changes thereto as the Seller and the Purchaser shall mutually approve).  The Seller and the Purchaser shall give prompt notice to each other of (i) any written notice or other written communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated hereby is not likely to be obtained prior to Closing, and (ii) any written objection or proceeding that challenges such transactions or the entry of the Transaction Approval Order.  The Seller shall use its best efforts to cause a hearing on the Sale Procedures Motion on December 29, 2009.

SECTION 5.02   <u>Bidding Procedures</u>.  The Bidding Procedures Order shall, among other matters: (i) approve the bidding procedures, including the requirements of a Qualified Overbid, substantially in the form reflected in <u>Exhibit D</u> attached hereto (with such changes thereto as the Seller and the Purchaser shall mutually approve) (the "<u>Bidding Procedures</u>"); (ii) approve the Break-Up Fee in accordance with the terms set forth herein; (iii) fix the time and date of an auction (the "<u>Auction</u>") at which higher and better offers may be presented to the Seller; (iv) schedule a hearing to consider entry of the Transaction Approval Order; (v) provide that notice of such hearing be given to all of the Seller's creditors, interest holders, any known party asserting or who may assert a Lien, claim or interest against the Seller or the Purchased Assets, the IRS, all state/local taxing authorities in jurisdictions where the Seller has or may have any Tax liability, and potential other purchasers identified by the Seller and otherwise in accordance with Bankruptcy Rule 2002; and (vi) approve the form of this Agreement.

SECTION 5.03   <u>Transaction Approval Order</u>.  The Transaction Approval Order shall, among other matters:  (i) approve the Agreement with the Purchaser, (ii) approve the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in this Agreement; (iii) state that the sale of the Purchased Assets to Purchaser shall be free and clear of all Liens, Environmental Liabilities, Liabilities and Obligations, Welfare Benefits, claims, interests and encumbrances whatsoever (except as expressly provided in this Agreement); (iv) authorize the Seller to assume and assign to Purchaser the Assigned Contracts and fixing Cure Costs in connection therewith; and (v) include a specific finding that Purchaser is a good faith purchaser of the Purchased Assets.  The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining the Transaction Approval Order,

ATLANTA:5199621.1

including, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Purchaser under this Agreement and demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

SECTION 5.04    Appeal.  In the event the entry of the Bidding Procedures Order or the Transaction Approval Order shall be appealed, the Seller and the Purchaser shall use their respective reasonable best efforts to defend such appeal.  Notwithstanding anything to the contrary set forth herein, nothing herein shall negate or limit the requirement of a finding that the Purchaser is entitled to protections under Section 363(m) of the Bankruptcy Code.

SECTION 5.05    Break-Up Fee.  Upon the occurrence of a Compensable Termination Event, the Purchaser shall be entitled, in consideration for the release of its rights under this Agreement, to payment of a break-up fee (not dependent on amounts actually expended or incurred by the Purchaser) in cash or other immediately available funds in the amount of $800,000, as further described in the Bidding Procedures Order (the "Break-Up Fee").  A "Compensable Termination Event" shall have occurred if the Purchaser is not in material breach of this Agreement (and the Purchaser has not otherwise terminated this Agreement pursuant to Section 8.01) and either (i) the Bankruptcy Court approves a Qualified Overbid (that is not a credit bid) other than the Purchaser's Bid, and the closing of a transaction in respect of such other Qualified Overbid has occurred or (ii) the Seller subsequently liquidates or otherwise disposes of a material portion of the Purchased Assets (other than via credit bidding) in one or a series of transactions consummated with a single acquirer or group of affiliated acquirers on or before September 14, 2010.  The Break-Up Fee shall be made to the Purchaser concurrently with the occurrence of a Compensable Termination Event.

SECTION 5.06    Assumption of Assigned Contracts.

(a)      The Seller and the Purchaser shall use commercially reasonable efforts to obtain an order of the Bankruptcy Court authorizing the Seller to assume the Assigned Contracts and assign to the Purchaser all Assigned Contracts at the Closing.  At any time and from time to time prior to receipt of the Transaction Approval Order, the Purchaser may, by written notice to Seller, elect to exclude any one or more of the Material Contracts (including any lease pursuant to which the Leased Real Property is leased by the Seller) or Permits and Licenses, from this transaction, provided that the Purchase Price shall not be reduced as a result of such notice.  Any Material Contract or Permit and License identified in such a notice (each, an "Excluded Contract") shall no longer be an Assigned Contract or an Assigned Permit and License that is a part of the Purchased Assets.

(b)      At the time of Closing, and subject to the approval of the Bankruptcy Court, and subject to acceptance by the Purchaser of the terms of the Assigned Contracts as they may be renegotiated as provided in this Agreement, the Seller shall assume and then assign to the Purchaser, and the Purchaser shall assume from the Seller, all the Assigned Contracts.

(c)      Utilizing amounts from the Asserted Cured Costs Deposit, the Purchaser shall make provision for the payment of, the cure and reinstatement costs and expenses (collectively, the "Cure Costs") of the Assigned Contracts, and the costs and expenses

relating to the assumption and assignment of the Assigned Contracts; provided, for clarity's sake, that the Purchaser shall not assume any Environmental Liability of the Seller in respect of or related to any of the Leased Real Property. The Seller shall use its reasonable best efforts to establish the proper Cure Costs, if any, for each Assigned Contract, including the filing and prosecution of any and all appropriate motions in the Bankruptcy Court.

(d)    Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, the Seller will not reject, without prior consent of the Purchaser, any Material Contract.

(e)    From and after the Closing, the Purchaser shall be obligated to pay all amounts for services rendered and goods provided, in each case, from and after the Closing, under the Assigned Contracts in accordance with the terms and conditions of such Assigned Contracts, and shall provide to such counterparty reasonable assurances of future performance. Any amounts for services rendered and goods provided under the Material Contracts during the period before the Closing shall not be an Assumed Liability of the Purchaser.

SECTION 5.07    Conduct of Business Prior to the Closing. The Seller covenants and agrees that, except as described in Section 5.07 of the Disclosure Schedule, between the date hereof and the Closing Date, the Seller, to the extent related solely to the Purchased Assets and the Business and taking into account past practice, its current and projected financial condition and the condition of the markets in which the Business operates: (i) shall conduct its business in the ordinary course, taking into account its status as a debtor in possession under Chapter 11 of the Bankruptcy Code, in all material respects; and (ii) (A) will maintain all Tool Inventories; (B) will maintain in force all existing policies of insurance against Loss relating to the Purchased Assets; (C) will not sell, lease or otherwise transfer or dispose of any Purchased Assets, or any interest therein; (D) will not effect any involuntary termination of its employees who otherwise were potentially to be offered employment by the Purchaser pursuant to Article VI, without providing the Purchaser with reasonable notice of the same and a reasonable opportunity to consult with the Seller on the identification of the terminated employees; (E) without the prior written consent of the Purchaser, will not fail to exercise any rights of renewal with respect to any material Leased Real Property that by its terms would otherwise expire; (F) will use its commercially reasonable efforts to maintain in all material respects the relations and goodwill with customers and others having business relationships with the Seller in connection with the Purchased Assets and the Business; (G) will not encumber or cause Liens to be placed on the Owned Real Property or the Leased Real Property, except pursuant to the existing Debtor in Possession Loan Agreement; and (H) without the prior written consent of Purchaser, will not agree to take any of the actions specified in this Section 5.07, except as contemplated by this Agreement and the Ancillary Agreements.

SECTION 5.08    Access to Information. From the date hereof until the Closing, upon reasonable notice, the Seller shall, and shall cause its respective officers, directors, employees, agents, representatives, accountants and counsel to: (a) afford the Purchaser and its officers, employees, and authorized agents, lenders and representatives reasonable access to the offices, properties and books and records of the Seller (to the extent relating to the Purchased Assets or the Business); and (b) furnish to the officers, employees, and authorized agents, lenders and

34

representatives of the Purchaser such additional financial and operating data and other information regarding the Business (or copies thereof) as the Purchaser may from time to time reasonably request; provided, however, that any such access or furnishing of information shall be conducted at the Purchaser's expense, during normal business hours, under the supervision of the Seller's personnel and in such a manner as not to unreasonably interfere with the normal operations of the Business. The parties acknowledge that the general access rights granted under the foregoing sentence include the right of the Purchaser to stage personnel of the Purchaser on site at the Seller's premises during normal business hours in order to effectuate an orderly transition of the Business to the Purchaser. Notwithstanding anything to the contrary in this Agreement, the Seller shall not be required to disclose any information to the Purchaser if such disclosure would, in the Seller's reasonable discretion, (i) jeopardize any attorney-client or other legal privilege, (ii) contravene any applicable Laws, fiduciary duty or binding agreement entered into prior to the date hereof, or (iii) contravene its legal duties as a debtor in possession with the responsibilities of attaining the highest and best offer for the Purchased Assets and the Business.

SECTION 5.09    Damage or Destruction.

(a)    Until the Closing, the Purchased Assets shall remain at the risk of the Seller. In the event of any material damage to or destruction of any Purchased Asset (other than normal wear and tear) prior to the Closing (in any such case, a "Loss"), the Seller shall give written notice thereof to the Purchaser and the Purchaser shall have the option, exercisable by written notice to the Seller given within five (5) Business Days after the Seller's notice of such Loss:

(i)    to reduce the Purchase Price by an amount equal to (A) the estimated cost to repair or restore the Purchased Assets affected by such Loss (the "Affected Assets") to substantially their condition immediately prior to the occurrence of such Loss or (B) if the Affected Assets are destroyed or damaged beyond repair, the replacement cost of the Affected Assets and, in either case, to complete this transaction as provided in this Agreement, in which event all insurance proceeds or other compensation payable on account of such Loss shall be retained by the Seller, or

(ii)    to reduce the Purchase Price by an amount equal to the deductible amount under any policies of insurance covering such Loss, in which event all proceeds of insurance or other compensation for such Loss shall be payable to the Purchaser, all right and claim of the Seller in and to any such amounts shall be assigned and (if previously received by the Seller) paid to the Purchaser at the Closing, and the Purchaser shall complete the Transactions as provided in this Agreement without any additional reduction in the Purchase Price, or

(iii)    if such Loss results in a failure of the condition set forth in Section 7.02(a), or such loss would have a material adverse impact on the Purchaser's planned operations, to terminate this Agreement in accordance with Section 8.01.

(b)    If Seller gives written notice of a Loss pursuant to Section 5.09(a) within five (5) Business Days prior to the scheduled Closing Date and the Purchaser does not elect to terminate this Agreement pursuant to Section 5.09(a)(iii), the Closing shall be postponed until the date which is five (5) Business Days after the later of (i) the date on which such

ATLANTA:5199621.1

written notice is given by the Seller and (ii) if applicable, the date on which any reduction to the Purchase Price is determined by an insurance adjuster pursuant to Section 5.09(c).

(c) If Purchaser elects to reduce the Purchase Price pursuant to Section 5.09(a)(i), the Seller and the Purchaser shall negotiate in good faith in an effort to agree upon the amount of such reduction. If they are unable to reach agreement within five (5) Business Days after written notice of the Loss is given by the Seller, then the amount of the reduction shall be determined by an independent, qualified insurance adjuster selected by the parties (or, if they are unable to agree on such selection, one appointed by the Bankruptcy Court upon application by either party).

SECTION 5.10 Confidentiality.

(a) The terms of the Non-Disclosure Agreement, dated as of October 2, 2009 (the "Confidentiality Agreement") by and between the Seller and the Purchaser are hereby incorporated herein by reference, and shall continue in full force and effect until the Closing, at which time the obligations of the Purchaser under the Confidentiality Agreement shall terminate; provided, however, that if this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with its terms.

(b) Nothing provided to the Purchaser pursuant to Section 5.08 shall in any way amend or diminish the Purchaser's obligations under the Confidentiality Agreement. The Purchaser acknowledges and agrees that any "Confidential Information" or "Evaluation Material" (as defined in the Confidentiality Agreement) provided to the Purchaser pursuant to Section 5.08 shall be subject to the terms and conditions of the Confidentiality Agreement. In the event of termination of this Agreement pursuant to Section 8.01, the Purchaser shall turn over to the Seller all information provided to the Purchaser by the Seller regarding the Business that the Purchaser has obtained pursuant to Section 5.08.

(c) Notwithstanding anything herein to the contrary, each party hereto (and its representatives, agents and employees) may consult any legal or Tax advisor regarding the Tax treatment and Tax structure of the Transactions, and may disclose to any person, without limitation of any kind, the Tax treatment and Tax structure of such transactions and all materials (including opinions and other Tax analyses) that are provided relating to such treatment or structure.

SECTION 5.11 Regulatory and Other Authorizations; Notices and Consents. The Purchaser and the Seller shall each use their reasonable best efforts to promptly obtain all authorizations, notices to proceed, consents, orders and approvals of all Governmental Authorities and officials that are necessary for their respective execution and delivery of, and the performance of their respective obligations pursuant to, this Agreement, and each of the Ancillary Agreements and will cooperate fully with the other party in promptly seeking to obtain all such authorizations, consents, orders and approvals. In furtherance of the foregoing, to the extent that any authorizations, consents, orders and approvals contemplated by this Agreement are not obtained by the Closing Date, including without limitation the consent of CSX Transportation, Inc. referred to in Section 5.29, the parties hereto shall use their best efforts to

36

ATLANTA:5199621.1

obtain such authorizations, consents, orders and approvals as soon as practicable after the Closing Date.

SECTION 5.12    Permits and Licenses.

(a)    Commencing on the date of this Agreement, the parties, cooperating in good faith, shall use reasonable best efforts to take such steps, including the filing of any required applications with Governmental Authorities, as may be necessary (i) to effect the transfer of the Permits and Licenses to the Purchaser on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable Law, and (ii) to enable the Purchaser to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Owned Real Property and the Leased Real Property from and after the Closing Date (the actions described in the foregoing clauses (i) and (ii) being referred to herein as the "Permitting Process").  Any filing or other fees and other out-of-pocket expenses associated with the Permitting Process shall be paid by the Purchaser.

(b)    The Purchaser acknowledges that it may not be possible to complete the Permitting Process prior to the Closing Date and, except as set forth in Section 7.02, agrees that completion of the Permitting Process prior to the Closing Date shall not be a condition to its obligation to proceed with the Transactions as provided in this Agreement.

SECTION 5.13    Retained Names and Marks.  The Purchaser hereby acknowledges that all right, title and interest in and to the names "Bender Shipbuilding & Repair Co., Inc.," together with all variations thereof and all trademarks, service marks, domain names, trade names, trade dress, corporate names and acronyms thereof and all trademarks, service marks, domain names, trade names, trade dress, corporate names and other identifiers of source or goodwill containing, incorporating or associated with any of the foregoing (the "Retained Names and Marks") are owned exclusively by the Seller.  On or prior to the Closing Date, the Seller shall identify to the Purchaser where the Retained Names and Marks are displayed on the Purchased Assets, and within six (6) months of the Closing Date the Purchaser shall remove or obliterate all Retained Names and Marks from the Purchased Assets.  The Purchaser further acknowledges that it has no rights, and is not acquiring any rights, to use the Retained Names and Marks, except that the Purchaser may continue to display such Retained Names and Marks on the Purchased Assets in the same manner as is the case on the Closing Date until such Retained Names and Marks are removed or obliterated in accordance with this Section 5.13.

SECTION 5.14    Bulk Transfer Laws.  The Purchaser hereby waives compliance by the Seller with any applicable bulk sale or bulk transfer laws of any jurisdiction in connection with the sale of the Purchased Assets to the Purchaser.

SECTION 5.15    Further Action.  The parties hereto shall use all reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the Transactions.

ATLANTA:5199621.1

SECTION 5.16    Tax Cooperation and Exchange of Information.    The parties hereto will provide the other parties with such cooperation and information as may be reasonably requested in filing any Tax Return, amended Tax Return or claim for refund; determining any liability for Taxes or a right to a refund of Taxes; or participating in or conducting any audit or other proceeding in respect of Taxes relating to the Purchased Assets or the Business.    Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules and related work papers and documents relating to rulings or other determinations by taxing authorities.    Each of the parties will make themselves (and their respective employees) available, on a mutually convenient basis, to provide explanations of any documents or information provided under this Section 5.16.    Each of the parties will retain all Tax Returns, schedules and work papers and all material records or other documents in its possession (or in the possession of its Affiliates) relating to Tax matters relevant to the Purchased Assets or the Business for the taxable period first ending after the Closing and for all prior taxable periods (the "Tax Documents") until the later of (i) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions, or (ii) six (6) years following the due date (without extension) for such Tax Returns. After such time, before either party shall dispose of any such documents in its possession (or in the possession of its Affiliates), the other party shall be given the opportunity, after 90 days' prior written notice, to remove and retain all or any part of such documents as the other party may select (at such other party's expense).    In the event that the Seller is liquidated or otherwise ceases to be a going concern prior to the expiration of the period described in the second preceding sentence, the Seller shall offer the Purchaser the opportunity described in the preceding sentence (with 90 days' prior written notice or such shorter period of notice as may be practicable) to remove and retain Tax Documents, and the Seller may then dispose of any such documents not removed by Purchaser.    If it is not practical to give the other party the right to retain Tax Documents, the other party may instead be given a reasonable opportunity to make copies of such Tax Documents at its own expense.    Any information obtained under this Section 5.16 shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for a refund, or in conducting an audit or other proceeding.

SECTION 5.17    Payment of Taxes.    In the event that any Conveyance Taxes are assessed on the transfer of the Purchased Assets to the Purchaser, the Seller shall pay the entire amount of such Conveyance Taxes.    The Seller shall complete and file all Tax Returns associated therewith.    Prior to the Closing Date, the Seller shall complete and file all returns associated with *ad valorem* Taxes of any nature.

SECTION 5.18    Proration of Taxes and Certain Charges.

(a)    Except as provided in this Section 5.18, all Property Taxes levied with respect to the Purchased Assets for any taxable period that includes the day before the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between the Seller and the Purchaser as of 12:01 A.M. Central time on the Closing Date.    If any Taxes subject to proration are paid by the Purchaser, on the one hand, or the Seller, on the other hand, the proportionate amount of such Taxes paid (or in the event a refund of any portion of such Taxes previously paid is received, such refund) shall be

38

ATLANTA:5199621.1

paid promptly by (or to) the other party after the payment of such Taxes (or promptly following the receipt of any such refund).

(b)     Except as otherwise provided in this Agreement, all installments of special assessments or other charges on or with respect to the Purchased Assets payable by the Seller for any period in which the Closing Date shall occur, including base rent, common area maintenance, royalties, all municipal, utility or authority charges for water, sewer, electric or gas charges, garbage or waste removal, and cost of fuel, shall be apportioned as of the Closing, and each party shall pay its proportionate share promptly upon the receipt of any bill, statement or other charge with respect thereto. If assessment of such charges or rates is based either upon time or for a specified period, such charges or rates shall be prorated as of 12:01 A.M. Central time on the Closing Date. If assessment of such charges or rates is based upon usage of utility or similar services, such charges shall be prorated pursuant to meter readings taken on the Closing Date.

(c)     All refunds, reimbursements, installments of base rent, additional rent, license fees or other use-related revenue receivable by any party, to the extent attributable to the Purchased Assets, for any period in which the Closing shall occur shall be prorated so that the Seller shall be entitled to that portion of any such installment applicable to the period up to, but, not including the Closing Date, and the Purchaser shall be entitled to that portion of any such installment applicable to any period from and after the Closing Date, and if the Purchaser or the Seller, as the case may be, shall receive any such payments after the Closing Date, it shall promptly remit to the other party its share of such payments.

SECTION 5.19     Personal Information.     In respect of any Personal Information contained in the books and records of the Seller that the Purchaser has had access to or acquires at the Closing, the Purchaser will: (a) before the Closing, use the Personal Information solely for purposes relating to the Transactions and, if the Closing does not occur, return the Personal Information to the Seller; and (b) if the Closing does occur, then after the Closing, use and disclose any such Personal Information only for necessary employment purposes in compliance with all applicable Laws.

SECTION 5.20     Reserved.

SECTION 5.21     Work in Progress.  The Purchaser and the Seller acknowledge that the Seller may have work in progress that will need to be completed after the Closing Date, and the Purchaser agrees that the Seller shall complete such work in progress pursuant to the terms of the Facilities Use Agreement.

SECTION 5.22     Additional Easements and Shared Utilities.

(a)     If, following the Closing Date, any additional utility easement is required for the Purchaser's operations that is reasonably required to cross any properties of the Seller or its Affiliates, the Seller agrees to grant such easement or to cause its Affiliates to grant such easement, to the Purchaser or the utility provider, subject to reasonable easement terms and conditions and at no cost to the Purchaser.  To the extent that Seller or its Affiliate must

39

ATLANTA:5199621.1

obtain the consent of any lender in order to effectuate the foregoing, the Seller shall obtain such consent prior to the Closing Date.

(b)     Prior to the Closing Date and at the Seller's sole expense, the Seller shall make arrangements to (i) segregate the electrical utilities that currently service the Purchased Assets and the Seller's other adjoining property, and (ii) install an electrical meter on the Seller's other adjoining property, so that the Seller's electrical utilities usage after the Closing Date will be billed directly to the Seller.  Such segregation and meter installation shall occur on or immediately following the Closing Date.  Until such segregation and meter installation is completed, the Purchaser agrees that the Seller may continue to use the electrical utilities located on the Purchased Assets in exchange for an agreed-upon fee equal to 3% of the total prorated monthly bill for such utilities services.  Amounts due to the Purchaser hereunder are due and payable by the Seller to the Purchaser within 10 days of the Purchaser providing an invoice therefor to the Seller.  If the Seller fails to pay the utility charge within such 10-day period, the Purchaser may elect to charge the Seller the maximum rate of interest allowable under applicable Laws until such time as the Seller has satisfied its obligations under this Section 5.22.

SECTION 5.23     Reserved.

SECTION 5.24     Location of Purchased Assets.  The Seller covenants and agrees that, following the date of this Agreement, but prior to the Closing Date, the Seller shall move all Purchased Assets not located on the Owned Real Property or the Leased Real Property to the Owned Real Property or Leased Real Property (as specified by the Purchaser) at the Seller's expense.  The Seller shall provide the Purchaser with at least three (3) days' prior notice of any such movement of Purchased Assets to the Owned Real Property or the Leased Real Property, and shall allow the Purchaser or its Representatives to observe such movement.

SECTION 5.25     Removal of Excluded Assets.

(a)     The Seller covenants and agrees that the Seller shall remove all Excluded Assets located on the Owned Real Property or the Leased Real Property to a location other than the Owned Real Property or the Leased Real Property at the Seller's expense.  Without limiting the foregoing, the Seller shall remove the GulfMark Assets (as defined below), it being understood that such contract and such materials are not included among the Purchased Assets or the Assumed Liabilities.

(b)     "GulfMark Assets" shall mean Hull 8184, Hull 8188 and Hull 8192 as identified by that certain "Shipbuilding Contract" dated July 31, 2007, between the Seller and GulfMark Offshore, Inc. ("GulfMark"), as may have been modified by that certain "Change Order #7004" dated October 13, 2008 (collectively, the "GulfMark Contract"), together with all assembled component parts, materials, equipment, fixtures, machinery and steel acquired for the performance of said contract in accordance with the terms set forth therein, including all identifiable parts, materials, equipment, fixtures, machinery and steel identified to the contract pursuant to the terms of said "Change Order #7004", regardless of whether said items have actually been assembled or installed upon any hull.  The GulfMark Assets shall further include all engineering, design work and related intellectual property to the extent

40

ATLANTA:5199621.1

provided in the GulfMark Contract. Nothing in this Section 5.25 shall be deemed to be an admission or finding of ownership of the GulfMark Assets, which is expressly reserved for adjudication in that certain adversary proceeding pending in the Bankruptcy Court (Adversary Proceeding Case Number 09-1094). In the event GulfMark notifies the Purchaser and the Seller prior to the commencement of the Auction that it believes in good faith that any GulfMark Asset has been scheduled as a Purchased Asset, then unless otherwise mutually agreed by the Purchaser and the Seller, such assets will be excluded from the definition of Purchased Assets, and the Purchase Price will be adjusted in accordance with Section 2.06.

      (c)    Seller shall (a) remove all Excluded Assets (other than the GulfMark Assets), including all assets leased by the Seller from Complete Equipment, Inc. other than the CEI Equipment, in accordance with this Section 5.25 within one (1) month after the Closing Date, and (b) remove the GulfMark Assets and cause its creditors and any other parties who own other assets located on the Owned Real Property or the Leased Real Property to remove such assets within three (3) months after the Closing Date. The Seller shall provide the Purchaser with at least three (3) days' prior notice of any such movement of Excluded Assets off of the Owned Real Property or the Leased Real Property, and shall allow the Purchaser or its Representatives to observe such movement. In the event that the removal of any assets from the Owned Real Property or the Leased Real Property is not completed within the applicable time period required pursuant to this Section 5.25, then (i) the Purchaser shall have the right to remove any such assets to a location designated by the Seller (or if the Seller fails to designate a location, to a location selected by the Purchaser), (ii) the Purchaser shall have no responsibility, liability or obligation with respect to any such assets, including related to the removal and storage thereof, and (iii) the Purchaser shall be entitled to an allowed administrative expense priority claim pursuant to Section 503(b) of the Bankruptcy Code in respect of its costs and expenses in connection with removing and storing such assets.

      SECTION 5.26   Vehicle Registration. Effective upon the Closing, the Seller and the Purchaser shall arrange for the transfer the registration of all registered trucks, cars, other vehicles and rolling stock included in the Purchased Assets into the Purchaser's name. The Purchaser covenants and agrees that it shall not use such trucks, cars, other vehicles or rolling stock until such registrations have been so transferred.

      SECTION 5.27   Grant of Licenses.

      (a)    Effective as of the Effective Time, the Seller hereby grants to the Purchaser a non-exclusive, perpetual, royalty-free license to use, modify and sublicense to its Affiliates the Seller's Winship software in both object code and source code form, together with product documentation, user documentation, and other helpful information (collectively, the "Winship Software") for the Purchaser to gain the benefit of the license granted in this Section 5.27. The Seller shall provide copies of such object code, source code, product documentation and user documentation to the Purchaser at the Effective Time.

      (b)    Effective as of the Effective Time, the Seller hereby grants to the Purchaser a non-exclusive, perpetual, royalty-free license to use, modify and sublicense to its Affiliates the Vessel Designs listed in Section 2.01(a)(viii) of the Disclosure Schedule, together with

41

detailed construction information, procedures and numerically controlled (NC) machine information, in the marketing, selling, construction, testing and delivery of the vessels derived from such designs. The Seller shall provide copies of such designs and information and related documentation to the Purchaser at the Effective Time. For the avoidance of doubt, (a) except as provided in Subsections 5.27(b)(ii) and (iii) below, the Seller is granting a license to use, modify and sublicense the Vessel Designs only to the extent that it has a right to grant such a license without assuming and assigning to the Purchaser any Contract in accordance with the Bankruptcy Code, and (b) such license shall be royalty-free as between the Seller and the Purchaser. The parties further agree as follows:

(i) The parties acknowledge and agree that certain of the Vessel Designs may be subject to a license arrangement or other agreement with a third party (a "Vessel License Arrangement"). Immediately after the execution of this Agreement, the Seller shall use its best efforts to identify any Vessel License Arrangements or other matters (such as Actions or third party disputes) that may affect the Seller's rights and obligations with respect to the Vessel Designs, and the Seller shall make available to the Purchaser all of the Seller's books and records pertaining to such Vessel License Arrangements in order for the Purchaser to assess the Seller's rights and obligations with respect to the Vessel Designs.

(ii) To the extent that any Vessel License Arrangement is identified as a Material Contract prior to the Closing Date, then the Purchaser shall acquire the rights and assume the obligations with respect to such Vessel License Arrangement only to the extent that such Vessel License Arrangement is an Assigned Contract hereunder; provided, however, that, any such Vessel License Arrangement shall only be deemed an Assigned Contract if the Purchaser elects that it should be treated as such, on or after the date that the amount of the Cure Costs owing under such Vessel License Arrangement, if any, are finally determined, whether by consent of the parties or by final order that is not subject to reconsideration, modification, appeal or stay (the "Cure Determination Date"); provided further that, if such Vessel License Arrangement is an Assigned Contract hereunder, then the Cure Costs, if any, owing under such Vessel License Arrangement as finally determined on the Cure Determination Date shall be the responsibility of the Purchaser and shall not be subject to the Asserted Cure Costs Escrow Agreement or the provisions of Section 5.06.

(iii) To the extent that additional Vessel License Arrangements are identified after the Closing Date, then, at the Purchaser's request, the Seller shall use its best efforts to seek the right to assign such Vessel License Arrangements to the Purchaser such that the Purchaser obtains such rights and obligations as the Purchaser would have obtained had such Vessel License Arrangements been treated as Assigned Contracts hereunder (the "Post-Closing Assigned Contracts"), as modified in this Section 5.27(b)(iii). In furtherance of the foregoing, if required by the Bankruptcy Code, the Seller will serve notice on the counterparties to such Post-Closing Assigned Contracts of any Cure Costs, if any, owing under such Post-Closing Assigned Contracts and of the Seller's intention to assume and assign such Post-Closing Assigned Contracts to the Purchaser in accordance with the Bankruptcy Code, and such counterparties shall have twelve (12) days thereafter to object to any Cure Costs, if any, and to the assumption and assignment to the Purchaser of such Post-Closing Assigned Contracts, unless such period is shortened by the Bankruptcy Court. In conjunction with serving such notice, the Seller will seek to obtain an order from the Bankruptcy Court permitting, at the election of the Purchaser made

42

on or after the Cure Determination Date, to assume and assign such Post-Closing Assigned Contracts to the Purchaser and asking that, if no objection to the Cure Costs for the respective Post Closing Assigned Contract is timely filed and served, the Cure Costs set forth in the notice provided by the Seller be binding upon the respective counterparty or counterparties to the Post Closing Assigned Contract for all purposes. To the extent that any Post-Closing Assigned Contracts are, at the Purchaser's election, assumed by the Seller and assigned to the Purchaser in accordance with the provisions of this <u>Section 5.27(b)(iii)</u>, then the Purchaser shall be responsible for the payment of the Cure Costs, if any, that are determined on the Cure Determination Date and such Cure Costs shall not be subject to the Asserted Cure Costs Escrow Agreement or the provisions of <u>Section 5.06</u>.

(iv)   For the avoidance of doubt, under no circumstances shall the Purchaser assume any Liabilities and Obligations to any third parties with respect to the Vessel Designs, including any Cure Costs, other than through its formal assumption of an Assigned Contract or Post-Closing Assigned Contract in accordance with the provisions of the Bankruptcy Code and this <u>Section 5.27(b)</u>.

(c)   The licenses granted hereunder are assignable by the Purchaser, to any of its Affiliates, successors-in-interest, or to any lender of the foregoing. The licenses granted under this Agreement shall be treated as a license of rights to "intellectual property" (as defined in the Bankruptcy Code) for purposes of Section 365(n) of the Bankruptcy Code. The parties agree that Purchaser and it sublicensees and successors-in-interest may elect to retain and may fully exercise all rights and elections under the Bankruptcy Code provided that such party abides by the terms of this Agreement, including without limitation the terms of all licenses granted hereunder.

SECTION 5.28   <u>Complete Equipment</u>. Prior to the Closing, the Seller shall cause Complete Equipment, Inc. ("<u>CEI</u>") to transfer to the Seller, free and clear of all Liens, Liabilities and Obligations, good and marketable title to the equipment currently owned by CEI and designated as "Complete" in the column under the "Owner" heading on <u>Section 2.01(a)(ii)</u> of the Disclosure Schedule (the "<u>CEI Equipment</u>"), which equipment is currently leased by the Seller pursuant to leases by and between the Seller and CEI (the "<u>CEI Equipment Leases</u>"). Such transfer shall be consummated pursuant to documentation reasonably approved by the Purchaser, and all CEI Equipment shall be included among the Purchased Assets at the Closing. In furtherance of the foregoing, on or prior to the Closing Date, the Seller shall obtain an order from the Bankruptcy Court (the "<u>CEI Order</u>"), in a form reasonably acceptable to Purchaser, permitting the Seller to (1) reject the CEI Equipment Leases; and (2) accept title to the CEI Equipment  free and clear of all Liens, Liabilities and Obligations. Nothing herein, or in the Bidding Procedures Order, shall be deemed to impair, limit or impact the rights and remedies of any lenders or lessors to CEI who have an interest in the CEI Equipment, such rights and remedies being expressly preserved for the CEI Order.

SECTION 5.29   <u>Acquisition/Lease of Additional Yards</u>.

(a)   In connection with the Closing, the Affiliate Leases shall be treated as Assigned Contracts and the Seller shall assume and assign such Affiliate Leases to the Purchaser, subject to the Purchaser and the appropriate counterparty entering into (i) an

ATLANTA:5199621.1
Case 09-12616   Doc 667-1   Filed 12/30/09   Entered 12/30/09 16:33:18   Desc
Exhibit B   Page 49 of 62

amended and restated lease agreement, effective as of the Closing Date, in substantially the form of Exhibit F, with respect to the real and personal property owned by Bender Ship Repair Company, Inc. that are currently leased to the Seller and which real property is commonly known as Yard 4 (the "Yard 4 Lease"), subject to such modifications as may be required (and are reasonably acceptable to the Purchaser) to obtain a non-disturbance agreement from Regions Bank and the consent of Regions Bank to the extent required under the mortgage documents related to such property, or as mutually agreed upon by Purchaser, Seller and Regions Bank, (ii) an amended and restated lease agreement, effective as of the Closing Date, in substantially the form of Exhibit F, with respect to (A) the real property owned by RAP, LLC, that is currently ground leased to Seller with an address of 651 Royal Street (North Baldwin Warehouse) and located on a portion of a tract of land commonly known as Plot A, and (B) subject to obtaining the consent of CSX Transportation, Inc., to the extent required, the portion of real property owned by CSX Transportation, Inc. that is currently leased to RAP, LLC and described on Exhibit H attached hereto (the "Plot A Lease"), and (iii) an amended and restated lease agreement, effective as of the Closing Date, substantially in the form of Exhibit F, the real property and improvements owned by Complete Equipment, Inc. that are currently leased to the Seller and are located on a portion of real property commonly known as Yard 12 at Royal and Elmira Streets, and (the "Yard 12 Lease").

(b)     Following the execution of this Agreement, the Purchaser shall be entitled to contact and negotiate with the owners of the (i) the real property owned by Emily S. Hearin, William J. Hearin, Louise S. Brock, Katherine V. Hamilton, Thomas B. Van Antwerp, and Staples L. Shearer (with Thames, Jackson, Harris Co., Inc. as agent for said landlord) that is currently leased to the Seller and is commonly known as Yard 7, (ii) the real property and improvements thereon owned by Pinto Island Land Company, Inc. that are currently leased to Seller and which real property is located in the northern portion of a tract of land commonly known as Yard 8, and (iii) the real property owned by Mobile River Terminal Company that is currently licensed to the Seller and is located at the southern end of a tract of land commonly known as Yard 8 and extending eastward towards the Mobile River (collectively, the "Additional Yards"), in order to acquire or lease the Additional Yards, as the case may be, as of the Closing Date. The Seller shall facilitate such contact and shall cooperate with the Purchaser in connection with such negotiations as reasonably requested by the Purchaser. To the extent any Additional Yard is subject to a Real Property Lease that is an Assigned Contract, the Seller shall work with the Purchaser to obtain a written amendment modifying the terms of such leases as of the Closing Date so as to have terms reasonably acceptable to Purchaser, including purchase price and provisions for remediation and a lease term (including options exercisable by the Purchaser in its sole discretion) of not less than thirty (30) years.

(c)     Prior to the Closing Date, without the prior written consent of the Purchaser, the Seller shall not agree to any amendment or modification of the terms of (i) that certain Sublease Agreement dated August 1, 2001, by and between the Seller, as lessor, and Waterways Towing & Offshore Services, Inc., as lessee, (ii) that certain Lease dated May 1, 2009, by and between the Seller, as lessor, and Warrior & Gulf Navigation Company, as lessee.

ATLANTA:5199621.1

Case 09-12616    Doc 667-1    Filed 12/30/09    Entered 12/30/09 16:33:18    Desc
Exhibit B    Page 50 of 62

SECTION 5.30    Bender Noncompetition and Consulting Agreement.  The Purchaser and the Seller acknowledge that, following the execution of this Agreement, the Purchaser and Thomas Bender intend to negotiate in good faith in an effort to agree upon a noncompetition and consulting agreement that, if mutually agreed, would be entered into between the Purchaser and Thomas Bender on the Closing Date.

ARTICLE VI

EMPLOYEE MATTERS

SECTION 6.01    Employees.  Effective as of the Closing, the Purchaser may (but shall not be required to) offer employment to certain Employees actively employed in the Business as of the Closing Date.  The Employees accepting such offer are referred to herein as the "Transferred Employees".  The Purchaser shall provide a list of Transferred Employees to Seller at least two (2) days prior to the Closing.  In compliance with applicable Laws, the Seller will give or cause to be given notice of termination of employment effective as of the Closing to all Transferred Employees and shall waive all non-competition agreements and other restrictive covenants in force with respect to such Transferred Employees.  The Seller shall retain all responsibility for all Employees other than the Transferred Employees.  Nothing in this Agreement shall obligate the Purchaser to make any offer of employment to anyone other than any person whom the Purchaser may in its discretion designate in writing (including without limitation by making an offer of employment to any such person) to be an Transferred Employee or to provide continued employment to any Employee or other worker of the Seller, whether or not the subject of an employment offer from the Purchaser, for any specified period of time following the Closing, or to maintain the same terms of employment (including compensation and benefits) for any specified period of time following the Closing.  The Purchaser is not assuming any employment contracts or any Liabilities and Obligations related to any Employees.  Nothing herein express or implied confers upon any Employee any rights or remedies of any nature, kind or character whatsoever under or by reason of this provision.

SECTION 6.02    Employee Plans.  The Seller acknowledges, that notwithstanding the sale and purchase of the Purchased Assets hereunder, the Seller shall be and remain solely responsible for all obligations to current and former Employees for compensation and benefits under the Employee Plans, including any benefits to which an Employee is or would have been entitled upon termination of employment (by way of retirement or otherwise) at the Closing Date and any benefits to which any former Employees may be entitled at any time, and all other obligations with respect to the employment of the Employees by Seller.  The Seller agrees to continue to comply with all applicable Laws with respect to the Employee Plans, and agrees that it will cause the accounts in such Employee Plans of all Transferred Employees to be fully vested and non-forfeitable as of the Closing Date, and shall distribute such benefits which the Transferred Employees shall become entitled to receive from the Seller in accordance with the applicable Employee Plan document and the Transferred Employees' elections, as applicable.  The Purchaser shall have no Liabilities and Obligations with respect to any Employee Plan.

SECTION 6.03    Labor Contracts.  The Purchaser does not agree to assume any collective bargaining agreements or other labor contracts which the Seller has entered into with third-party labor unions representing any Employee.

ATLANTA:5199621.1

SECTION 6.04    <u>WARN Act</u>.  To the extent, if any, required by the WARN Act, and any similar state law, the Seller shall be responsible for notifying any Employees of the termination of their employment by the Seller as of the Closing Date.  The Seller agrees to indemnify, defend, and hold harmless the Purchaser from and against any and all Liabilities and Obligations arising or alleged to arise under the WARN Act in respect of the termination of any Employee on, or prior to, the Closing Date.

SECTION 6.05    <u>COBRA Obligations</u>.  Notwithstanding anything to the contrary in this Agreement, the Seller shall retain all Liabilities and Obligations, and the Purchaser shall have no liability, with respect to the provision of notices, election periods, and benefits with respect to any Employee Plan pursuant to Section 4980B of the Tax Code or Part 6 of Subtitle B of Title 1 of ERISA, and similar state laws, to any Employees or other individuals associated with any Employees with respect to qualifying events occurring at any time, whether before or after the Closing Date, and whether or not in connection with the Transactions.

SECTION 6.06    <u>Payment and Expenses at Closing</u>.  The Seller will be responsible for all payments made and all expenses and costs required to be paid in connection with the termination of employment of the Employees, including payment of all severance pay (if any) due under the Seller's severance policies to Employees of the Business who are not offered employment with the Purchaser.  Immediately following the Closing, the Seller will pay to each Transferred Employee the full amount of any and all banked and supplemental vacation, paid time off, and overtime entitlement of such Employee (including vacation pay) as of the Closing, subject to the limitations of such payments by the Bankruptcy Code.

SECTION 6.07    <u>Employee Access and Records</u>.  The Seller shall make available to the Purchaser for review records which are located on the Seller's premises or in the Seller's possession, and which provide information regarding Employees' names, dates of hire by the Seller, salary histories, performance ratings and evaluations, and disciplinary warnings or actions for all Employees.  The Seller shall make the Employees available to the Purchaser, during normal business hours and upon reasonable request, for interviews and pre-hire screenings, subject to Employees' approval on a case-by-case basis.

ARTICLE VII

CONDITIONS TO CLOSING

SECTION 7.01    <u>Conditions to Obligations of the Seller</u>.  The obligations of the Seller to consummate the Transactions shall be subject to the fulfillment or written waiver by the Seller, at or prior to the Closing, of each of the following conditions:

(a)    <u>Representations, Warranties and Covenants</u>.  (i) The representations and warranties of the Purchaser contained in this Agreement (A) that are not qualified as to "materiality" shall be true and correct in all material respects as of the Closing, and (B) that are qualified as to "materiality", shall be true and correct as of the Closing, except to the extent such representations and warranties are made as of another date, in which case such representations and warranties shall be true and correct in all material respects or true and correct, as the case may be, as of such other date; and (ii) the covenants and agreements

46

ATLANTA:5199621.1

contained in this Agreement to be complied with by the Purchaser on or before the Closing shall have been complied with in all material respects.

(b)     Reserved.

(c)     No Order.   No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Governmental Order (whether temporary, preliminary or permanent) that has the effect of making the Transactions illegal or otherwise restraining or prohibiting their consummation.

(d)     Approval of Orders.   The Bankruptcy Court shall have (i) approved the Bidding Procedures Order and (ii) entered a Transaction Approval Order, which shall not be subject to a stay by any court of competent jurisdiction.

SECTION 7.02     Conditions to Obligations of the Purchaser.   The obligations of the Purchaser to consummate the Transactions shall be subject to the fulfillment or written waiver by the Purchaser, at or prior to the Closing, of each of the following conditions:

(a)     Representations, Warranties and Covenants.   (i) The representations and warranties of the Seller contained in this Agreement (A) that are not qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all material respects as of the Closing and (B) that are qualified as to "materiality" or "Material Adverse Effect" shall be true and correct as of the Closing, other than such representations and warranties that are made as of another date, in which case such representations and warranties shall be true and correct in all material respects or true and correct, as the case may be, as of such other date, and (ii) the covenants and agreements contained in this Agreement to be complied with by the Seller  at or before the Closing shall have been complied with in all material respects.

(b)     Reserved.

(c)     No Order.   No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Governmental Order (whether temporary, preliminary or permanent) that has the effect of making the Transactions illegal or otherwise restraining or prohibiting their consummation.

(d)     Approval of Orders.   The Bankruptcy Court shall have (i) approved the Bidding Procedures Order and (ii) entered a Transaction Approval Order, which shall be a Final Order; provided, however, that, in accordance with the Transaction Approval Order and any other applicable order, if any, at the Purchaser's election, the Purchaser may waive the requirement that the Transaction Approval Order be a Final Order.

(e)     No Material Adverse Effect.   Since the date of this Agreement, there shall not have occurred any state of facts, event or change in circumstance that has had or could reasonably be expected to have a Material Adverse Effect on the Purchased Assets, as a whole.

(f)     No Proceedings.   Since the date of this Agreement, there shall not have been commenced or threatened against the Seller or any Affiliate of the Seller any proceeding that

could reasonably be expected to have the effect of preventing or making illegal the Transactions.

(g) _Acquisition/Lease of Additional Yards_. Contemporaneously with the Closing, the Purchaser shall have (i) entered into leases for the Affiliate Sites in substantially the form of _Exhibit F_, and (ii) acquired or leased the Additional Yards on terms satisfactory to the Purchaser in its sole discretion, including purchase price and lease term (including options exercisable by the Purchaser in its sole discretion) of not less than thirty (30) years; provided that obtaining the consent of CSX Transportation, Inc. with respect to the Plot A Lease shall not be a condition precedent to the Closing.

(h) _Reserved_.

(i) _Required Permits and Licenses_.  The Seller shall have transferred to the Purchaser, or the Purchaser shall have been issued from the relevant Governmental Authority, the Permits and Licenses (or replacements therefor, as the case may be), set forth in _Section 7.02(i)_ of the Disclosure Schedule and such Permits and Licenses shall be in full force and effect.

(j) _Assigned Contracts_.  Provided the Purchaser has provided adequate assurance of future performance, as required under the Bankruptcy Code, to effect the assumption and assignment of the Assigned Contracts, all of the Assigned Contracts shall (i) be in full force and effect on the Closing Date and (ii) be assignable to the Purchaser without the consent of the counterparty to such Assigned Contract for such assignment (or such consent shall have been received prior to the Closing Date).

(k) _Bar Date; Notice of Same_.  The Seller shall provide actual notice of the sale of the Purchased Assets to the Purchaser to the Seller's creditors and any other Persons who may have claims against the Seller or the Bankruptcy Estate, including all Employees and all Governmental Authorities with oversight of environmental or employee matters relating to the Seller or the Business.  Additionally, at such time as the Bankruptcy Court shall have established a deadline or "bar date" for the filing of proofs of claim against the Bankruptcy Estate, the Seller shall provide actual notice of such bar date to the Seller's creditors and any other Persons who may have claims against the Seller or the Bankruptcy Estate.

(l) _Real Estate; Title Commitments; Environmental Reports_.

(i) From the date of this Agreement until Closing, the Purchaser and its Representatives, engineers, and surveyors shall have the right to go on the Owned Real Property and Leased Real Property during normal business hours (or at such other times as Seller may approve in advance in writing) to inspect and survey the Owned Real Property and Leased Real Property and improvements thereon, and to conduct relevant studies and make other determinations which, in the sole opinion of Purchaser, are necessary to determine the condition of the Owned Real Property and Leased Real Property.  The Purchaser shall bear all costs and expenses of conducting the aforementioned surveys and studies.  The Purchaser shall have confirmed to its satisfaction that there has been no material change to the condition of the Owned Real Property and the Leased Real Property as of the Closing Date.

48

(ii)     The Purchaser shall have received from the Title Company an irrevocable commitment to issue standard or, if requested by the Purchaser, extended title insurance on each parcel of Owned Real Property and Leased Real Property, in form and substance and with such exceptions as are satisfactory to the Purchaser in its sole discretion, and including any required special endorsements (including, but not limited to, a creditor's rights endorsement).

(iii)     The Purchaser shall have received, from each landlord of Leased Real Property, a binding commitment to enter into a new lease or agree to an assignment of each of the Leased Real Properties, with amendments required by the Purchaser, on terms and conditions acceptable to the Purchaser, it being a condition of Closing that the Purchaser must be able to acquire acceptable leasehold interests in each of the Leased Real Properties.

(iv)     Reserved.

(v)     The Purchaser shall have received a signed commitment from the escrow officer to close the transaction in accordance with the Purchaser's escrow instructions. The Purchaser must have reviewed and signed all documents required by the Title Company to transfer the Owned Real Property and the Leased Real Property and to issue a title insurance policy, as described above, for each of the required documents. Closing costs will be shared, as is customary, provided, however, that the Purchaser shall pay the cost of standard title insurance and any additional premium required for extended coverage or special endorsements, if so ordered by the Purchaser. The Seller shall have cooperated as necessary in order for the Purchaser to obtain extended coverage or any special endorsement requested by the Purchaser. The Title Company shall record all Deeds and issue all title policy commitments immediately prior to the Closing, and no funds shall be disbursed to Seller unless and until the foregoing has occurred.

(vi)     The Purchaser shall, in its sole discretion, be satisfied that it has access to a public right-of-way and through any existing utility corridors located within any of the Seller's properties in order to install any additional services required for the Purchaser's operations. The Purchaser shall have also been granted an access easement in order to maintain, repair or replace any existing utility services for the Owned Real Property and Leased Real Property that are located in whole. or in part, on the Seller's properties. The Purchaser, in its reasonable discretion, shall be satisfied that it has access to, and use of, all water ways required to perform ship repair operations as contemplated by this Agreement. The Purchaser shall be satisfied, in its reasonable discretion, that it has sufficient rights of access, ingress and egress over all public and private rights of way located in, on, about or serving the Owned Real Property or Leased Real Property, including without limitation satisfaction that any railroad facilities do not impair such rights of access, ingress or egress.

(m)     <u>Insurance Policy Actions</u>.    The Purchaser shall have received evidence reasonably satisfactory to the Purchaser to confirm that the Insurance Policies remain in full force and effect as of the Closing Date and, to the extent enforceable, shall continue in full force and effect through not earlier than the date that is two weeks after the Closing Date.

(n)     <u>Tax Payments</u>. The Seller shall have (i) filed and paid all Taxes due (whether or not deemed delinquent by any Governmental Authority) in respect of any Prorated Tax

49

Payments and Conveyance Taxes, including, but not limited to, *ad valorem* Taxes related to any of the Owned Real Property, the Leased Real Property or the Purchased Assets and (ii) provided the Purchaser with evidence reasonably satisfactory to the Purchaser of such Tax payments.

(o)     Complete Equipment.  The Seller shall have obtained good and marketable title to the CEI Equipment in order to facilitate the sale of such CEI Equipment to the Purchaser as contemplated by this Agreement, and the Seller shall have obtained an order from the Bankruptcy Court, in a form reasonably acceptable to Purchaser, permitting the Seller to (1) reject the CEI Equipment Leases; and (2) accept title to the CEI Equipment free and clear of all Liens, Liabilities and Obligations.

ARTICLE VIII

TERMINATION, AMENDMENT AND WAIVER

SECTION 8.01    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)     by either the Seller or the Purchaser if: (i) the Purchaser is not reasonably satisfied with all of its conditions to its obligations to close as described in this Agreement; (ii) the Bidding Procedures Order has not been entered by the Bankruptcy Court on or prior to the date that is 45 days after the date of this Agreement; (iii) the Purchaser is not selected as the successful bidder in accordance with the Bidding Procedures; (iv) in the event that the Purchaser is selected as the successful bidder in accordance with the Bidding Procedures, the Transaction Approval Order has not been entered by the Bankruptcy Court on or prior to the Termination Date; or (v) the Closing shall not have occurred by the Termination Date; provided, however, that the right to terminate this Agreement under this Section 8.01(a) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date;

(b)     by either the Purchaser or the Seller in the event that any Governmental Order restraining, enjoining or otherwise prohibiting the Transactions shall have become final and nonappealable;

(c)     by the Seller if the Purchaser shall have breached any of its representations, warranties, covenants or other agreements contained in this Agreement, which would give rise to the failure of a condition, as set forth in Article VII, which breach cannot be or has not been cured within ten (10) days following the Purchaser's receipt of written notice of such breach from the Seller, as the same may be extended by mutual written agreement of the parties provided, however, that the right to terminate this Agreement under this Section 8.01(c) shall not be available to the Seller if the Seller is in breach of any of its representations, warranties, covenants or other agreements contained in this Agreement as of such date;

50

(d)     by the Purchaser if the Seller shall have breached any of its representations, warranties, covenants or other agreements contained in this Agreement, which would give rise to the failure of a condition, as set forth in Article VII, which breach cannot be or has not been cured within ten (10) days following the Seller's receipt of written notice of such breach from the Purchaser, as the same may be extended by mutual written agreement of the parties provided, however, that the right to terminate this Agreement under this Section 8.01(d) shall not be available to the Purchaser if the Purchaser is in breach of any of its representations, warranties, covenants or other agreements contained in this Agreement as of such date;

(e)     by the Purchaser if any of the following terms are modified in the Bid Procedures Order from the terms set forth in Exhibit D without the Purchaser's consent: (i) the amount of the Break-Up Fee amount, or (ii) the timing for payment to the Purchaser of the Break-Up Fee.

(f)     ipso facto, notwithstanding anything in this Agreement to the contrary, if the Bankruptcy Court does not approve this Agreement, regardless of whether the Purchaser and/or the Seller is in breach of any of its representations, warranties, covenants or other agreements contained in this Agreement; or

(g)     by the written consent of each of the Seller and the Purchaser.

SECTION 8.02     Effect of Termination.  In the event of termination of this Agreement as provided in Section 8.01, this Agreement shall forthwith become void, and there shall be no liability on the part of any party hereto, except: (a) as set forth in Section 2.07(b), Section 5.05, Section 5.10 and Article X; and (b) that nothing herein shall relieve either party from liability for any breach of this Agreement occurring prior to such termination.

ARTICLE IX

NON-SURVIVAL OF REPRESENTATIONS AND WARRANTIES

SECTION 9.01     Non-Survival of Representations and Warranties.  The representations, warranties and covenants in this Agreement (other than covenants that, by their terms, survive the Closing or termination of this Agreement) shall terminate at the Closing, or upon termination of this Agreement pursuant to Section 8.01, and, following the Closing or the termination of this Agreement, as the case may be, no party shall make any claim whatsoever for any breach of any representation, warranty or such covenant hereunder, subject to Section 8.02.

ARTICLE X

GENERAL PROVISIONS

SECTION 10.01     Expenses.  Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

51

SECTION 10.02 <u>Notices</u>.    All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 10.02</u>):

if to the Seller:

Bender Shipbuilding & Repair Co., Inc.
265 S. Water Street
P.O. Box 42
Mobile, AL 36601
Facsimile: (251) 432-2260
Attention:  Thomas B. Bender, Jr.

with a copy to:

Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Facsimile: (504) 310-9195
Attention: Stewart F. Peck, Esq.

if to the Purchaser:

Vision Technologies Marine, Inc.
c/o VT Halter Marine, Inc.
900 Bayou Casotte Parkway
Pascagoula, MS 39581
Facsimile: (228) 696-6890
Attention: Bill Skinner

and

Vision Technologies Marine, Inc.
c/o Singapore Technologies Marine Ltd
16 Benoi Road
Singapore 629889
Facsimile: (65) 68611601
Attention: Gill Parmesh Singh

ATLANTA:5199621.1

with a copy to:

McKenna Long & Aldridge LLP
303 Peachtree Street NE
Suite 5300
Atlanta, GA 30308
Facsimile: (404) 527-4198
Attention: Jeremy C. Silverman, Esq.

SECTION 10.03 <u>Public Announcements</u>. Neither of the parties to this Agreement nor their Representatives shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the Transactions, or otherwise communicate with any member of the news media, without the prior written consent of the other parties, except as otherwise required by Law or in filings in the Bankruptcy Court or office of the United States Bankruptcy Administrator, and the parties to this Agreement shall cooperate as to the timing and contents of any such press release, public announcement or communication. Each party shall be responsible for any release, announcement or communication by its Representatives in contravention of this Section.

SECTION 10.04 <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to either party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible, in an acceptable manner, in order to consummate the Transactions as originally contemplated, to the greatest extent possible.

SECTION 10.05 <u>Entire Agreement</u>. This Agreement, the Ancillary Agreements and the Confidentiality Agreements constitute the entire agreement of the parties hereto with respect to the subject matter hereof and thereof, and supersede all prior agreements and undertakings, both written and oral, between the Seller and the Purchaser with respect to the subject matter hereof and thereof, including without limitation the Original Agreement (other than the Schedules and Exhibits to the Original Agreement, which shall remain unmodified by this Agreement).

SECTION 10.06 <u>Assignment</u>. This Agreement may not be assigned by operation of law or otherwise without the express written consent of the Seller and the Purchaser (which consent may be granted or withheld in the sole discretion of the Seller or the Purchaser, as the case may be). Notwithstanding the foregoing, prior to Closing, the Purchaser may assign its right to purchase any of the Purchased Assets hereunder to another Person, <u>provided,</u> <u>however</u> that the same shall not relieve the Purchaser of any of its obligations to the Seller hereunder, and <u>provided,</u> <u>further,</u> that under no circumstances shall such assignment delay the sale of any or all of the Purchased Assets hereunder. Regarding any such assignment, references to the Purchaser, in this Agreement, other than the preceding sentence, shall be deemed to apply *mutatis mutandis* to the Purchaser's assignee in respect of the rights so assigned.

53

ATLANTA:5199621.1

SECTION 10.07  Amendment.  This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the Seller and the Purchaser or (b) by a waiver in accordance with Section 10.08.

SECTION 10.08  Waiver.  Any party to this Agreement may: (a) extend the time for the performance of any of the obligations or other acts of the other party; (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto; or (c) waive compliance with any of the agreements of the other party or conditions to such other party's obligations contained herein.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of either party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

SECTION 10.09  No Third Party Beneficiaries.  This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to, or shall confer upon, any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

SECTION 10.10  Liquidated Damages.  The Purchaser and the Seller agree that it would be impractical and extremely difficult to accurately estimate the damages that the Seller would suffer if the Closing does not occur by reason of the sole default of the Purchaser.  Therefore, the Purchaser and the Seller agree that if the Seller terminates this Agreement in accordance with Section 8.01(c), the Purchaser shall be obligated to pay liquidated damages in the amount of the Purchaser's Deposit (which for the avoidance of doubt, shall be limited to the Purchaser's Initial Deposit if the Purchaser's Additional Deposit was not paid pursuant to Section 2.07) in accordance with the terms of the Deposit Escrow Agreement, and the receipt by the Seller of the Purchaser's Deposit shall be the Seller's sole and exclusive remedy as liquidated damages and not as a forfeiture or penalty.

SECTION 10.11  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York and, to the extent applicable, the Bankruptcy Code. The parties hereto agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement or the Transactions and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided, that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party: (a) agrees that all such actions or proceedings shall be heard and determined in a federal court sitting in The City of Mobile, Alabama; (b) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (c) consents that any such action or proceeding may be brought in such court and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party and its counsel at its address as provided in Section 10.02 (provided, that nothing herein

ATLANTA:5199621.1

shall affect the right to effect service of process in any other manner permitted by New York Law).

SECTION 10.12 <u>Waiver of Jury Trial</u>.  (a) EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS.  EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.12</u>.

SECTION 10.13 <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile and email transmission) in counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile, PDF file or other means of electronic transmission shall be effective as delivery of a manually executed counterpart to this Agreement.

*[Signatures on Following Page]*

ATLANTA:5199621.1

IN WITNESS WHEREOF, the Seller and the Purchaser have caused this Agreement to be executed as of the date first set forth above by their respective officers thereunto duly authorized.

BENDER SHIPBUILDING & REPAIR CO., INC.

By: _____
Name:
Title:


VISION TECHNOLOGIES MARINE, INC.

By: _____
Name:
Title: